James **LLEWELYN** and Studio Theatre Corporation, a Michigan Corporation, Plaintiffs,

v.

**OAKLAND COUNTY PROSECUTOR'S OFFICE et al., Defendants.**

Civ. A. No. 5–71667.

United States District Court, E. D. Michigan, S. D.

Oct. 15, 1975.

Supplemental Memorandum Opinion Nov. 10, 1975.

Marvin S. Shwedel, Faintuck, Shwedel, Roether, Wolfram & McDonald, Farmington Hills, Mich., for plaintiffs.

Frank K. Mandlebaum, Asst. Prosecuting Atty., Oakland County, Pontiac, Mich., for defendants.

## MEMORANDUM OPINION

FEIKENS, District Judge.

### I.

On August 27, 1975, Oakland County Prosecutor L. Brooks Patterson, defendant herein, conducted a search and made an arrest at the Studio North Theatre in the City of Ferndale. The search and arrest were made by agents of defendant pursuant to warrants issued by Judge Hunt of Michigan's 43rd District; a copy of a film entitled "Naked Came the Stranger" was seized and James D. Llewelyn, manager of the theatre and one of the plaintiffs herein, was placed under arrest and charged with showing an obscene motion picture in violation of M.C.L.A. § 750.343a. After arraignment, Llewelyn was released on bond.

On August 28, "Naked Came the Stranger" was again exhibited at Studio North and the theatre was again raided by defendant. A second copy of the film was seized and Llewelyn was again placed under arrest. This second raid was conducted pursuant to a warrant that was obtained by defendant from an Oakland County Circuit Judge after Judge Hunt had declined defendant's request for a second warrant.

On August 29, Judge Hunt held a hearing in which the subject film was viewed and arguments were heard from both sides. Judge Hunt made a preliminary finding of obscenity and ordered the case set down for trial. On the ground that *Heller v. New York*, 413 U. S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973) permitted the prosecutor to seize only one copy of an allegedly obscene motion picture (for evidentiary purposes pending a final adjudication of obscenity), Judge Hunt dismissed the prosecution arising out of the August 28 arrest, and ordered defendant to return the second copy of the film to Llewelyn. (This order was formalized by Judge Hunt in a document issued on September 11.)

Alleging that defendant refused to comply with Judge Hunt's order to return the second film to plaintiff, and that defendant, had stated to the local media his intention of seizing a copy of the film each day it was played, plaintiff Llewelyn and his co-plaintiff, Studio Theatre Corporation, filed a complaint for injunctive relief in this court on the afternoon of August 29.

Plaintiffs' verified complaint raised a substantial question whether defendant had embarked upon a course of harassment through multiple raids upon Studio North. This court accordingly issued an order directing defendant to appear before it on September 2 and show cause why a temporary restraining order should not be issued.

At 4:54 in the afternoon of August 29, defendant commenced an action in Oakland County Circuit Court, alleging that the film was obscene and that its exhibition therefore constituted a public nuisance in violation of M.C.L.A. § 600.-3801. Defendant asked that this alleged nuisance be abated by a permanent injunction and that the theatre's furniture, fixtures and contents be removed and sold. Pending a final adjudication, defendant asked that plaintiffs be temporarily restrained from maintaining a public nuisance at Studio North or elsewhere within the judicial circuit.

Circuit Judge Richard D. Kuhn (it later developed that the case was improperly assigned to Judge Kuhn), issued an ex parte temporary restraining order against plaintiffs, enjoining them from exhibiting the film anywhere within Oakland County, pending a final hearing on the nuisance action. Judge Kuhn's order was filed with the Oakland County Clerk at 5:49 in the afternoon of August 29, that is, some 55 minutes after the action had been commenced by defendant.

At a conference in chambers in this court on the morning of September 2, at which representatives of plaintiffs and defendant were present, defendant stated that in view of Judge Kuhn's order he had no present intent to make further raids upon Studio North. For this reason the show cause hearing scheduled for that day was adjourned until such time as further seizures might occur.

At a hearing in the afternoon of September 2, Judge Kuhn concluded that the public nuisance case had been erroneously assigned to him and ordered it transferred to Circuit Judge William R. Beasley.

On September 3, at a hearing convened at the request of plaintiffs, Judge Beasley reaffirmed the validity of the restraining order and continued it in effect.

On September 9, acting in response to an emergency appeal filed by plaintiffs, the Michigan Court of Appeals vacated Judge Kuhn's restraining order on the ground that it constituted "a forbidden prior restraint on activities presumptively protected by the First

Amendment by enjoining the showing of the named motion picture film without first having conducted an adversary proceeding [at which such film must be submitted as evidence to the trier of fact pursuant to *Miller v. California,* 413 U.S. 15, 24-25, [,93 S.Ct. 2607, 37 L.Ed. 2d 419] . . . (1973)] to determine whether said film is obscene". *State ex rel. Patterson v. Ealand,* No. 25521 (Sept. 9, 1975).

Upon being informed that the restraining order had been vacated, plaintiffs resumed exhibition of the subject film on the evening of September 12. Defendant then approached Judge Hunt and requested a warrant directing seizure of the film. When this request was denied, defendant requested a similar warrant from some six other district judges in the 43rd District, all of whom likewise denied the request. Finally, defendant succeeded in obtaining the desired warrant from Oakland County Circuit Judge James S. Thorburn, and conducted a raid on Studio North on the night of September 12. A third copy of the film was seized and plaintiff Llewelyn was incarcerated in the Oakland County Jail until the morning of September 13.

Exhibition of the film was resumed on September 13 and defendant sought and obtained yet a fourth search warrant, this time from District Judge John Osgood. A raid was conducted by defendant's agents that evening, a fourth copy of the film was seized and plaintiffs' projection equipment was removed from the theatre.

This court was approached immediately after that raid with a request for a temporary restraining order. On a finding as required by Rule 65(b) that the activities of defendant had resulted and would continue to result in immediate and irreparable injury to plaintiffs' first and fourteenth amendment rights, the court issued a temporary restraining order enjoining defendant from further arrests or seizures and ordering that the projection equipment be returned forthwith to plaintiffs. The court further ordered defendant to appear at a hearing on September 16 to show cause why the restraint should not be continued.

On September 15, Robert J. Turner, the City Attorney of Ferndale, filed an action in Oakland County Circuit Court to enforce Ordinance No. 610 (enacted on July 30, 1973 as an amendment to Ordinance No. 525), a zoning ordinance prohibiting the establishment of an "adult motion picture theatre" within 1,000 feet of any residence unless 51% of those residing within the 1,000 feet of the theatre sign a petition approving such use. The complaint alleged that under this ordinance in conjunction with M.C.L.A. § 125.587 Studio North constituted a nuisance per se, and asked for an ex parte temporary injunctive order pending a final hearing on the merits. Judge Beasley, to whom the case was assigned, heard argument on this motion from Turner and Robert H. Roether, a partner in the law firm that represented plaintiffs, who happened to be present in Judge Beasley's court on another matter. After argument, but without viewing the film, Judge Beasley issued a temporary restraining order, but stayed its effect until September 19 in view of the hearing scheduled for September 16 in this court.

On September 16, a show cause hearing was held in this court. Frank K. Mandelbaum appeared on behalf of defendant Patterson and urged that federal court abstention was appropriate in view of the doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 29 L.Ed.2d 669 (1971), and related cases. In essence, he argued that the pattern of raids upon Studio North did not come within the *Younger* exception for harassment because each arrest and seizure was made pursuant to a warrant issued by a state judge. *Hicks v. Miranda,* 43 U.S.L.W. 4857, 95 S.Ct. 2281, 45 L.Ed.2d 223 (U.S. June 24, 1975) was cited for the proposition that seizures and arrests pursuant to judicial warrants cannot constitute bad faith or

harassment. This issue will be discussed later in this opinion. Suffice it to say at this point that the court found defendant's conduct of multiple seizures and arrests to be harassment within the *Younger* exception, particularly in light of Mandelbaum's forthright admission in the course of argument that further raids were contemplated in the event this court's restraining order should be dissolved. It is evident that defendant's objective in this series of raids has been to effect a restraint upon the exhibition of a motion picture prior to an adjudication that the film is obscene. This was done in violation of the spirit if not the letter of a decision of the Michigan Court of Appeals. Accordingly, the restraining order was continued in effect and plaintiffs' motion for a preliminary injunction was taken under advisement. The parties were asked to return to this court on September 18 to report on which of the three actions against plaintiffs (that is, the criminal prosecution, the public nuisance action or the zoning action) would be pursued and when it would come to trial. The court encouraged both sides in this action, as well as Turner in the Ferndale zoning action, to seek the earliest possible final adjudication on the question of obscenity in state court.

On September 18, it was reported by the parties that, as to the criminal prosecution, a pretrial conference was scheduled for September 25, and jury selection was scheduled for October 7, with the trial to follow on October 9. Defendant Patterson stated that he had moved for an acceleration of the trial date. As to the civil nuisance action, it was reported that a conference had been held with Judge Beasley, wherein it was decided that the Ferndale zoning matter would be taken up first. As to the zoning case, it was reported that a hearing on the constitutionality of the Ferndale ordinance would be held before Judge Beasley on September 19. The court continued the restraint against defendant Patterson and took under advise-

ment plaintiffs' motion to amend their complaint to add Robert Turner as a party defendant, declare the Ferndale ordinance unconstitutional and restrain the enforcement of said ordinance.

On September 19, Judge Beasley ruled that the Ferndale ordinance was constitutional and put into effect the temporary restraining order originally issued on September 15. Plaintiffs then approached this court and renewed their request that the enforcement of the Ferndale ordinance be restrained. The court denied this motion on the ground that none of the exceptions to the *Younger* doctrine were applicable to Turner and the Ferndale zoning case, and that plaintiffs' recourse from the decision of Judge Beasley was therefore to the Michigan Court of Appeals. The restraint against defendant Patterson, however, was continued.

On September 24, defendant Patterson requested that the court take down the temporary restraining order against him, ten (10) days having elapsed since it was first issued. Defendant was unable to assure the court that he would refrain from conducting further raids until the film was adjudged to be obscene. Nevertheless, in view of Judge Beasley's restraining order against plaintiffs in the Ferndale zoning case, further showings of the film had ceased and further restraint against defendant Patterson was unnecessary. The court therefore removed the restraint against defendant Patterson, with the proviso that if Judge Beasley's restraining order against plaintiffs should be vacated for any reason, this court's restraining order would again take effect for a period of twenty-four (24) hours, or until such time as a hearing could be held to determine whether plaintiffs' motion for a preliminary injunction against defendant Patterson should be granted.

## II.

As illustrated by the chain of events recited above, this case raises important issues of federalism. Specifical-

ly, it requires the court to reconcile its mandate under 42 U.S.C. § 1983 to redress the deprivation under color of state law of federal constitutional rights with its duty not to interfere unnecessarily with the enforcement of state law by state officials in state courts. Guidance in this balancing process is provided by the opinions of the Supreme Court in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its recent progeny, *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L. Ed.2d 482 (1975), and *Hicks v. Miranda,* 43 U.S.L.W. 4857, 95 S.Ct. 2281, 45 L. Ed.2d 223 (U.S. June 24, 1975). Since federal relief in regard to all three state actions involved here was sought at a time when the state court proceedings were already in progress,[1] it is clear that unless one of the *Younger* exceptions is applicable, the federal court should stay its hand.

In *Younger v. Harris, supra,* the court reversed a three-judge federal district court's injunction that barred a state district attorney from prosecuting under an indictment charging violation of the California Criminal Syndicalism Act, on the ground that the plaintiff's constitutional rights could adequately be vindicated in the state courts. The Court stated that "the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution", 401 U.S. at 46, 91 S.Ct. at 751, before the irreparable injury justifying equitable intervention is made out. The Court also noted that the plaintiff had "failed to make any showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief". 401 U.S. at 54, 91 S.Ct. at 755.

In *Huffman v. Pursue, Ltd., supra,* the Court applied *Younger* to an action brought in federal district court to enjoin the enforcement of a state court judgment that ordered a movie theatre closed as a public nuisance for displaying obscene films. In thus extending *Younger* to civil as well as criminal cases, the Court noted the nuisance proceeding there involved was "both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials". 420 U.S. at 604, 95 S.Ct. at 1208.

In *Hicks v. Miranda, supra,* the Court applied *Younger* to an action to restrain enforcement of a criminal obscenity statute despite the fact that the state criminal complaint was amended to include the federal plaintiffs more than a month after their federal complaint was filed. The Court held that the three-judge federal district court had erred in its conclusion that the "pattern of seizure" there involved had brought the case within the *Younger* exception for official harassment and bad faith. The Court stated:

"[E]ach step in the pattern of seizures condemned by the District Court was authorized by judicial warrant or order; and the District Court did not purport to invalidate any of the four warrants, in any way to question the propriety of the proceedings in Superior Court or even to mention the reversal of the suppression order in the Appellate Department of that court. Absent at least some effort by the District Court to impeach the entitlement of the prosecuting officials to rely on repeated judicial authorization for their conduct, we cannot agree that bad faith and harassment were

1. Plaintiffs argue that *Younger* principles do not apply to their action to restrain defendant Patterson from *future* arrests and seizures, particularly since plaintiffs do not challenge here the constitutionality of the statute under which Patterson is proceeding. However, a criminal prosecution is pending before Judge Hunt as a result of the first in the series of raids, and the subsequent raids

are most realistically viewed as defendant Patterson's approach to the conduct of this single prosecution. Even if defendant is correct in his contention that each exhibition of the film is an independent offense, the series of charges would at most constitute separate counts in the same proceeding that was underway when plaintiffs first approached this court.

made out." 43 U.S.L.W. at 4862, 95 S.Ct. at 2293.

■ Defendant Patterson relies upon this language for the proposition that his series of raids upon Studio North cannot be found by this court to constitute harassment because they were conducted pursuant to judicial warrants. This argument, however, reads the Court's holding in *Hicks* far too broadly. The Court did not lay down a per se rule of federal abstention in every case in which a state official is able to obtain a warrant authorizing his conduct. Rather, the *Younger* exception for harassment requires the court to examine the entire factual context in which the allegedly harassing state action is taken, not to rely in conclusory fashion upon the presence or absence of a single factor such as a warrant. Indeed, the basis of the Supreme Court's holding in *Hicks* was the district court's failure to examine all of the relevant circumstances. As the Court stated, "[t]he relevant findings of the District Court were vague and conclusory". 43 U.S.L.W. at 4862, 95 S.Ct. at 2292. Since the exercise of prosecutorial discretion is subject to the strictures of the Constitution as surely as is the exercise of judicial authority, the act of applying for a warrant in the first instance may in a proper case be found to be in bad faith or an effort to harass, regardless whether a warrant is ultimately issued.

An examination of the circumstances in this case must include the legal as well as the factual context from which this case arose. Three separate proceedings are now pending against plaintiffs in state court with regard to their exhibition of "Naked Came the Stranger". Turning first to the criminal prosecution, defendant's raids were conducted in reliance upon M.C.L.A. § 750.343a (1968), a provision whose very applicability to plaintiffs' conduct is in substantial question. That section provides in relevant part:

"Any person who knowingly . . . shows . . . any obscene, lewd, lascivious, filthy or indecent, sadistic or masochistic . . . motion picture film . . . shall be guilty of a misdemeanor, and upon conviction shall be punished by imprisonment in the county jail for not more than 1 year or by a fine of not more than $1,000.00, or by both such fine and imprisonment."

In *People v. Bloss,* 388 Mich. 409, 201 N.W.2d 806 (1972), the Michigan Supreme Court reversed a conviction under M.C.L.A. § 750.343a for selling obscene literature on the ground that under the United States Supreme Court's obscenity standard as laid down in *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498 (1957), and *Redrup v. New York,* 386 U.S. 767, 87 S.Ct. 1414, 18 L. Ed.2d 515 (1967), expression was protected by the first amendment unless juveniles were involved or there was "obtrusive publication to an unwilling individual". 388 Mich. 422, 201 N.W.2d at 812. This decision was vacated and remanded in *Michigan v. Bloss,* 413 U.S. 909, 93 S.Ct. 3060, 37 L.Ed.2d 1021 (1973), for reconsideration in light of several new opinions on the obscenity issue, including *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Subsequently, in *People v. Bloss,* 394 Mich. 79, 228 N.W.2d 384 (1975), the Michigan Supreme Court held that the reversal should stand, since at the time of the defendant's acts, his conduct had not been proscribed under M.C.L.A. § 750.343a as construed by the court. While upholding the statute as applied to juveniles and unconsenting adults, the court stated:

"We are divided as to whether such statutes can properly be construed by us without further legislative expression as proscribing the dissemination of 'obscene' material to consenting adults." 394 Mich. at 81, 228 N.W.2d at 385.

While this statement is somewhat ambiguous, it must be read at least as a decision to preserve the status quo with regard to applying M.C.L.A. § 750.343a

to dissemination of material to consenting adults. The status quo at the time Bloss acted was that the statute could not be applied to such dissemination. In the absence of court decisions or legislative action to the contrary, it may reasonably be assumed that under present Michigan law, the statute continues to be inapplicable to the dissemination of materials to consenting adults.

In light of this recent gloss upon M.C.L.A. § 750.343a by the Michigan Supreme Court, plaintiffs contend that defendant's attempt to enforce the statute against them, despite the fact that the film in question was shown only to consenting adults,[2] itself constitutes bad faith for *Younger* purposes. While recognizing that this contention is not without merit, and that it is certainly a factor to be weighed in the ultimate assessment of defendant's conduct, the court need not decide whether this alone is sufficient to bring the case within the *Younger* exception. It should be noted, however, that this factor serves to distinguish the instant case from *Hicks,* in which no question was raised as to the applicability of the obscenity statute as a matter of state law, and the constitutionality of the statute there involved had been sustained by the United States Supreme Court. *See* 43 U.S.L.W. at 4859–60, 95 S.Ct. 2281. The prosecutor in *Hicks* had every reason to believe that he was enforcing a valid and factually applicable statute; defendant Patterson, in contrast, had reason to believe that the statute he was attempting to enforce did not apply.

The second action instituted against plaintiffs by defendant Patterson was based upon Michigan's civil nuisance statute, M.C.L.A. § 600.3801 (1968). That section provides in relevant part:

"Any building . . . used for the purpose of lewdness . . . is hereby declared a nuisance and the furniture, fixtures and contents of any such building . . . shall be enjoined and abated as hereinafter provided . . . ."

It was apparently not mere inadvertence that Michigan's more specific civil obscenity statute was not relied upon for defendant's cause of action. That statute, M.C.L.A. § 600.2938, provides in relevant part:

"(1) *Injunction.* The chief executive or legal office of any city, village, or charter township or prosecuting attorney of the county may institute and maintain an action in the circuit court against any person, firm or corporation to enjoin and prevent the sale or further sale or the distribution or further distribution or the acquisition or possession of any book, magazine, pamphlet, comic book, story paper, writing, paper, picture, drawing, photograph, figure or image or any written or printed matter of an indecent character, which is obscene, lewd, lascivious, filthy, indecent or disgusting . . . ."

While the statutory language does not expressly cover motion pictures, it does cover "pictures" and "photographs" as well as "any other written or printed matter". Moreover, it has been applied to motion pictures. *See Kent Prosecutor v. Goodrich Corp.,* 53 Mich.App. 267, 218 N.W.2d 771 (1974). The problem, however, with using M.C.L.A. § 600.2938 is that it was declared unconstitutional in the case just cited. The ground for

2. In an affidavit filed with this court on September 16, 1975, Robert H. Roether, a partner in the law firm representing plaintiffs, stated:

"20. That said film 'Naked Came the Stranger', shown at the Studio North Theatre in Ferndale, Michigan, was at all times shown only to consenting adults, i. e. those persons over the age of eighteen (18) years who sought admission to the film after being advised of the sexually oriented material exhibited therein by means of conspicuous posting of the 'X' rating of the film and the prohibition of admission to persons under the age of eighteen (18) years.

Defendant has not questioned the accuracy of this statement.

declaring it invalid was that it is "couched in terms of expression rather that specifically defined sexual conduct, as required by [*Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)]". 53 Mich.App. at 271, 218 N. W.2d at 773. By way of dictum, the Michigan Court of Appeals added that "there is no state law, either statutory or judicial, which 'specifically defines' the depictions of sexual conduct which the state may regulate". 53 Mich.App. at 275, 218 N.W.2d at 775.

The more specific civil obscenity statute having been declared unconstitutional for want of specificity, it may seem odd for defendant to invoke the more general civil nuisance proscription against "lewdness". Nonetheless, it cannot be said that this action was brought in bad faith, in view of a more recent decision by a different panel of the Michigan Court of Appeals upholding the application of M.C.L.A. § 600.-3801 to "lewd" motion pictures. *State v. Diversified Theatrical Corp.,* 59 Mich.App. 223, 229 N.W.2d 389 (1975).

■ While bringing the civil nuisance action was in itself neither bad faith nor harassment in the *Younger* sense, the manner in which defendant reacted to the reversal by the Michigan Court of Appeals of the temporary restraining order was both. It cannot be said that defendant was unaware of the first amendment prohibition against prior restraints on presumptively protected expression. At the latest he learned on August 29, when his second prosecution was dismissed by Judge Hunt, that *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), permits only a single seizure of an allegedly obscene motion picture for evidentiary purposes "pending a judicial determination of the obscenity issue in an adversary proceeding". 413 U.S. at 493, 93 S.Ct. at 2795. Defendant urged on oral argument that this "judicial determination" took place when Judge Hunt viewed the film and heard argument on August 29. This contention

lacks merit for two reasons. First, the very judge who made the asserted "judicial determination of obscenity" did not regard his own action as sufficient to comply with *Heller.* This is amply demonstrated by the fact that he dismissed the second prosecution, ordered the second copy of the film returned, and subsequently refused to issue further warrants. Defendant is attempting to give an effect to Judge Hunt's action that Judge Hunt himself expressly disclaimed. A judge and not the parties before him is the competent person to construe the effect of his rulings. Second, Judge Hunt quite properly ruled that *Heller* would be satisfied only after a trial on the merits in which the film was submitted as evidence to the trier of fact for a determination whether the film was obscene under the *Miller* guidelines. Anything short of this procedure would be constitutionally infirm as a prior restraint. In short, defendant not only refused to abide by Judge Hunt's order to return the second copy of the film, he refused to heed Judge Hunt's admonition regarding the requirements of the first amendment. The court finds that Judge Hunt's August 29 ruling did not constitute the "judicial determination of the obscenity issue" required by *Heller* and that defendant had no basis to believe in good faith that it did.

■ With this background, it appears that when the Michigan Court of Appeals reversed Judge Kuhn's temporary restraining order on September 9 as an unlawful prior restraint, there had been no judicial determination whether "Naked Came the Stranger" was in fact obscene under *Miller* and thus beyond the protection of the first amendment. As defendant was frank to admit on oral argument, he disagreed with the Court of Appeals' decision and felt that his only alternative was to engage in "guerrilla warfare" against Studio North. The court finds that defendant's raids on September 12 and 13 were conducted for the sole purpose of evading the

Court of Appeals' decision vacating the restraining order, that they had no legitimate law enforcement purpose, and that defendant was on ample notice from the Court of Appeals that an attempt to suppress the exhibition of the film at that time would violate plaintiffs' rights under the first amendment. Taken in the overall context of this case, these raids constituted bad faith and harassment sufficient to bring the case within the exception to *Younger* and permit federal court intervention despite the pendency of state court proceedings.

Defendant stated at oral argument that each showing of an obscene film was an independent violation of the obscenity statute, and that multiple arrests and seizures were therefore the only method at his disposal to enforce the statute. Assuming arguendo that defendant is correct in his contention that each showing is a separate offense, the seizure of the film is still not a necessary law enforcement measure. No allegation is made that different versions of the film were shown on different days. The single copy seized in the first raid would thus suffice for evidentiary purposes in a prosecution for each and every subsequent showing. Defendant need only keep records of each showing and add a new count to his complaint for each alleged offense. This is another factor distinguishing this case from the multiple seizures in *Hicks*. In that case, "[e]ach of the warrant affidavits other than the first one indicated that the film to be seized was in some respects different from the first print seized". 43 U.S.L.W. at 4857 n. 1, 95 S. Ct. at 2285 n. 1. It is thus arguable that multiple seizures were a legitimate law enforcement device in that case; no such argument is available to defendant here.

The third action against plaintiffs was brought by Robert Turner, the City Attorney of Ferndale, under a zoning ordinance. In essence, this ordinance makes it unlawful to establish an "adult motion picture theatre" within 1,000 feet of any residential building unless 51% (but no less than 150) of those living within 1,000 feet of the theatre consent in writing. "Adult motion picture theatre" is defined in § 24.00(2) of Ordinance No. 610 as follows:

> "An enclosed building with a capacity of fifty (50) or more persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing, or relating to 'specified sexual activities' or 'specified anatomical areas', (as defined below), for observation by patrons therein."

The "specified sexual activities" and "specified anatomical areas" are in turn defined by the ordinance.[3] While plaintiffs do not contest the factual applicability of this ordinance to Studio North, they asked this court to add Turner as a defendant, declare Ordinance No. 610 unconstitutional, and enjoin the ordinance's enforcement.

Since this zoning action was brought by a government agency in state court, it falls squarely within the scope of *Huffman v. Pursue, Ltd., supra.* This court must therefore abstain unless it finds "that the state proceeding is motivated by a desire to harass or is

---

3. Ordinance No. 610 § 24.00(4) provides:
 "(4) FOR THE PURPOSE OF THIS SECTION, 'SPECIFIED SEXUAL ACTIVITIES' IS DEFINED AS:
 (I) Human genitals in a state of sexual stimulation or arousal;
 (II) Acts of human masturbation, sexual intercourse or sodomy;
 (III) Fondling or other erotic touching of human genitals, pubic region, buttock or female breast.
 § 24.00(5) provides:

 "(5) FOR THE PURPOSE OF THIS SECTION, 'SPECIFIED ANATOMICAL AREAS' IS DEFINED AS:
 (I) Less than completely and opaquely covered:
 (A) Human Genitals, Pubic Region, (B) Buttock, and (C) Female breast below a point immediately above the top of the areola; and
 (II) Human male genitals in a discernibly turgid state even if completely and opaquely covered."

conducted in bad faith, or [that] the challenged statute is 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it' ". 420 U.S. at 611, 95 S.Ct. at 1212. Plaintiffs allege that Turner brought the zoning action in furtherance of a conspiracy with defendant Patterson, and argue that the finding of bad faith and harassment as to Patterson may thus be transferred to Turner for purposes of the *Huffman* exceptions. Whatever merit this argument might have as a matter of law, there is no evidence before this court in support of its factual premise, i. e., the alleged conspiracy. Turner and Patterson have maintained throughout the proceedings before this court that their actions were undertaken independently. Any inference that might be drawn from the timing of the zoning action is in itself legally insufficient to justify a finding of conspiracy.

Alternatively, plaintiffs argue that the zoning action falls within the third exception mentioned in *Huffman,* that is, patent unconstitutionality. In support of this argument they cite the recent decision of the United States Court of Appeals for the Sixth Circuit in *American Mini Theatres, Inc. v. Gribbs,* 518 F.2d 1014 (1975), wherein sections of a virtually identical ordinance of the City of Detroit were held invalid under the Equal Protection Clause. Plaintiffs point out that the Ferndale ordinance is even more restrictive of first amendment rights, since it requires adult theatres to distance themselves 1,000 feet from residential buildings, whereas the Detroit ordinance permitted such theatres to be located 500 feet from residential areas. The Ferndale ordinance is thus a fortiori unconstitutional, plaintiffs argue.

■ As a court bound by the decisions of the United States Court of Appeals for the Sixth Circuit, this court is compelled to agree that the corresponding portions of the Ferndale ordinance violate the Constitution. But the inquiry does not end there, as plaintiffs apparently contend. For it is not sufficient to satisfy the *Huffman* exception that the ordinance be merely unconstitutional. It must be "flagrantly and patently" unconstitutional. Regardless what decision this court might itself reach on the constitutionality *vel non* of the Ferndale ordinance, the *Huffman* exception is not satisfied unless reasonable minds could not differ on the constitutional issue. Moreover, the Detroit counterpart of the section of the Ferndale ordinance invoked here by Turner was invalidated by two judges of this district in *Nortown Theatre Inc. v. Gribbs,* 373 F.Supp. 363 (1974), and this ruling was apparently not challenged on appeal in *American Mini.* Thus the United States Court of Appeals for the Sixth Circuit did not pass on the Detroit counterpart of the particular section here involved. It does not detract in the slightest from the wisdom of the district court's decision in *Nortown* for this court to find that reasonable minds could disagree. The district court held that "[i]n prohibiting regulated uses within 500 feet of a single dwelling or living unit, the Ordinance imposes a greater incidental restriction on First Amendment freedoms than is essential to preserve and stabilize residental neighborhoods". 373 F.Supp. at 371. While this court might well concur in this factual assessment, the question of what degree of restriction is "essential" is necessarily subjective and hence open to reasonable dispute. Furthermore, what is "essential to preserve and stabilize residential neighborhoods" in Detroit may differ widely from what is essential for this purpose in Ferndale. The court therefore grants plaintiffs' motion to add Turner as a party defendant, but holds that since the zoning action brought by Turner does not fall within any of the *Huffman* exceptions, plaintiffs' motion for preliminary federal relief is denied. This holding is especially appropriate in view of the fact

that a state trial court has already ruled on the constitutionality of the Ferndale ordinance, a decision that is now on appeal. As noted in *Huffman, supra,* federal intervention prior to completion of state appellate proceedings is "a direct aspersion on the capabilities and good faith of state appellate courts". 420 U. S. at 608. This court has maintained from the outset that state judges are just as competent as federal judges to apply principles of constitutional law. The Michigan Court of Appeals has already demonstrated its ability to act promptly to prevent an unlawful prior restraint in this case. Once again, plaintiffs' most appropriate recourse is to that court.

## SUPPLEMENTAL MEMORANDUM OPINION

This opinion supplements the Memorandum Opinion issued in this cause on October 15, 1975.

On October 20, 1975 the Michigan Court of Appeals issued an order reversing and setting aside the temporary restraining order entered by Judge Beasley of the Oakland County Circuit Court on September 19, 1975, on the ground that the City of Ferndale had failed to carry its burden of proof on the issues of irreparable injury and possible success on the merits at trial. The Court of Appeals' order provides that Judge Beasley's restraining order is set aside until that case is determined on its merits, unless the defendant therein (plaintiffs herein) should not be prepared to try the

case within ten days. *City of Ferndale v. Ealand,* No. 25755 (October 20, 1975).

This action by the Court of Appeals triggered an extension of this court's own temporary restraining order, issued on a conditional basis on September 24, 1975, against defendant Patterson. Since this was an extension of the temporary restraining order that had been issued by this court on September 13, 1975, its duration was limited to a period of ten days from October 20.[1]

Plaintiffs brought the instant motion for a preliminary injunction against defendant Patterson in order to protect their rights beyond that period. At a hearing held on October 29, the court was informed that the criminal prosecution brought by defendant Patterson had ended in a mistrial on October 14 after the jury had been unable to reach a unanimous verdict. A second trial of that action has been set for December 3, 1975. No trial date has yet been established for defendant Turner's (City of Ferndale) zoning action, but a pretrial conference will be held in approximately three weeks. It thus appears that no adjudication of the question of the obscenity of "Naked Came the Stranger" will be had for some time.

Despite the fact that the film has not yet been adjudged obscene, despite the serious questions raised about the applicability of M.C.L.A. § 750.343a to the dissemination of materials to consenting adults by *People v. Bloss,* 394 Mich. 79, 228 N.W.2d 384 (1975), despite the clear first amendment prohibition against pri-

---

1. Federal Rule of Civil Procedure 65(b) provides that every temporary restraining order granted without notice "shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period . . . ." True, this temporary restraining order was not issued "without notice". Rather, it was issued after full oral argument. Moreover, an opinion was issued setting forth findings of fact and conclusions of law. Nevertheless, it has been stated that "[t]he fact that notice is given and a hearing held cannot serve to extend indefinitely beyond the period limited

by [Rule 65(b)] the time during which a temporary restraining order remains effective". *Pan American World Airways v. Flight Engineers Ass'n,* 306 F.2d 840, 842 (2d Cir. 1962), *quoted with approval in Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 443, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). Thus no temporary restraining order can remain in effect longer than ten days plus a ten-day extension. In this case, the order was in effect initially from September 13 through September 24; the extension period began on October 20 after an interim period during which there was no restraint.

or restraints upon the freedom of expression, *see, e. g., United States v. Thirty-Seven Photographs,* 402 U.S. 363, 367, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), and despite the fact that a copy of the film has already been seized for the purpose of preserving it as evidence as permitted by *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), defendant Patterson was still not prepared to assure this court that he would refrain from further arrests and seizures "pending a judicial determination of the obscenity issue in an adversary proceeding". 413 U.S. at 493, 93 S.Ct. at 2795. Patterson's reasons for this position were stated to be that: first, each showing of the film is a crime and a prosecutor has a duty to enforce the criminal law; and second, the only way to preserve each separate prosecution is to make individual seizures.

 The basic error of Patterson's position lies in his treatment of a prosecution for dissemination of materials presumptively protected by the first amendment in the same manner as any other criminal prosecution. At the hearing on this motion, Patterson's counsel analogized this case to a case involving bank robbery. Such an approach falls far short of the "necessary sensitivity to freedom of expression", *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965), required by the Constitution. It is not enough to stand on the prosecutor's oath to enforce the law. As stated in a similar case:

"This sort of 'law enforcement' censorship cannot be tolerated under either the First Amendment or the doctrines set forth in *Heller* and the preceding cases. The multiple seizures must be condemned as unconstitutional suppressions of the plaintiffs' First Amendment rights.

"The defendants' actions are not excused by reason of their needing to make seizures of the challenged films in order to preserve them as evidence for possible criminal prosecutions against the plaintiffs. The initial seizure of each separate film was all

that was needed to preserve their evidence for prosecution purposes." *Bradford v. Wade,* 386 F.Supp. 1156, 1160 (N.D.Tex.1974).

Patterson does not claim that different versions of the film are being shown on different days. Thus he already has all the evidence that needs to be seized for any future prosecutions. To prove that the film was shown on repeated occasions, he need only introduce testimony from witnesses who observed the additional showings. If necessary, he can assign police personnel to view the film on each showing, an approach that would not only be less restrictive of first amendment freedoms but possibly less expensive to the government than repeated raids upon the theater.

At the hearing on this motion none of the parties raised any genuine issues of material fact. It was thus unnecessary to supplement the record with additional evidentiary material. The present motion will be decided on the basis of the findings of fact in this court's previous opinion, the pleadings and uncontroverted affidavits in the file, and the statements of the parties on the record in open court to the extent these were uncontested.

 To obtain a preliminary injunction, plaintiffs must show (1) "a clear case of irreparable injury", (2) that "the balance of injury favor[s] the granting of the injunction", (3) a "probability of success on a trial", *Garlock, Inc. v. United Seal Inc.,* 404 F.2d 256 (6th Cir. 1968), *cited with approval in Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 441 n. 16, 94 S.Ct. 1113 (1974), and (4) that the issuance of the injunction is not contrary to the "public interest". *Huard-Steinheiser, Inc. v. Henry,* 280 F.2d 79 (6th Cir. 1960), *citing Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

As to irreparable injury, this court has found that:

"[Defendant Patterson's] raids on September 12 and 13 were conducted for the sole purpose of evading the [Michigan] Court of Appeals decision

vacating the restraining order, that they had no legitimate law enforcement purpose, and that defendant was on ample notice from the Court of Appeals that an attempt to suppress the exhibition of the film at that time would violate plaintiffs' rights under the first amendment. Taken in the overall context of this case, these raids constituted bad faith and harassment . . . ."

*Llewellyn v. Oakland Co. Prosecutor's Office*, No. 5–71667, Memorandum Opinion at 1388 (October 15, 1975). There has still been no adjudication of obscenity, and nothing else has changed the situation with regard to the propriety of arrests and seizures at this time. The court finds that further arrests and seizures are substantially certain to follow if this court's restraint is removed, and that such arrests and seizures would constitute a bad faith suppression of first amendment freedoms if conducted prior to an adjudication that the film is obscene. The prospect of bad faith law enforcement for the purpose of suppressing activities protected by the first amendment establishes the threat of irreparable injury required by traditional doctrines of equity. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

■ As to the balance of injury, the court finds that the negation of constitutional rights represented by further raids outweighs the injury, if any, to defendant's interest in enforcing the criminal law. As noted above, Patterson presently has all the evidence that need be seized in order to prosecute plaintiffs under the obscenity statute.

■ As to the probability of success on the trial, the issue is whether plaintiffs would probably succeed in establishing a claim under 42 U.S.C. § 1983 that Patterson's raids violated their constitutional rights under color of state law. The court finds that until there has been an adjudication that the film is obscene, further arrests and seizures would constitute violations of plaintiffs'

first amendment rights and thus violations of 42 U.S.C. § 1983. The likelihood of success on the merits is therefore high.

■ As to the public interest, the court finds little, if any, harm to the public in permitting this film to be shown until it has been adjudged obscene. Indeed, the fact that this is constitutionally required precludes this court from finding otherwise, since it may be assumed that the Constitution is the ultimate expression of the public interest. Even if the public morality would suffer from an extended showing of this film to consenting adults, which is far from certain, public morality will not appreciably be affected during the limited period necessary to reach an adjudication on the merits on the issue of obscenity in state court.

Accordingly, plaintiffs' motion for a preliminary injunction is granted.