# HELLER *v.* NEW YORK

No. 71–1043.   Argued November 14, 1972—Decided June 25, 1973

484

Burger, C. J., delivered the opinion of the Court, in which White, Blackmun, Powell, and Rehnquist, JJ., joined. Douglas, J., filed a dissenting opinion, *post*, p. 494. Brennan, J., filed a dissenting opinion, in which Stewart and Marshall, JJ., joined, *post*, p. 494.

*Irving Anolik* argued the cause and filed a brief for petitioner.

*Lewis R. Friedman* argued the cause for respondent. With him on the brief were *Frank S. Hogan* and *Michael R. Juviler.**

Mr. Chief Justice Burger delivered the opinion of of the Court.

We granted certiorari in this case to determine whether a judicial officer authorized to issue warrants, who has viewed a film and finds it to be obscene, can issue a constitutionally valid warrant for the film's seizure as evidence in a prosecution against the exhibitor, without first conducting an adversary hearing on the issue of probable obscenity.

---

*Briefs of *amici curiae* urging affirmance were filed by *Evelle J. Younger*, Attorney General, *Edward A. Hinz, Jr.*, Chief Assistant Attorney General, *Doris H. Maier* and *Edward P. O'Brien*, Assistant Attorneys General, and *Robert R. Granucci* and *Clifford K. Thompson, Jr.*, Deputy Attorneys General, for the State of California; and by *Charles H. Keating, Jr., pro se, Richard M. Bertsch, James J. Clancy*, and *Albert S. Johnston III* for Charles H. Keating, Jr.

Petitioner was manager of a commercial movie theater in the Greenwich Village area of New York City. On July 29, 1969, a film called "Blue Movie" was exhibited there. The film depicts a nude couple engaged in ultimate sexual acts. Three police officers saw part of the film. Apparently on the basis of their observations, an assistant district attorney of New York County requested a judge of the New York Criminal Court to see a performance. On July 31, 1969, the judge, accompanied by a police inspector, purchased a ticket and saw the entire film. There were about 100 other persons in the audience. Neither the judge nor the police inspector recalled any signs restricting admission to adults.[1]

At the end of the film, the judge, without any discussions with the police inspector, signed a search warrant for the seizure of the film and three "John Doe" warrants for the arrest of the theater manager, the projectionist, and the ticket taker, respectively. No one at the theater was notified or consulted prior to the issuance of the warrants. The judge signed the warrants because "it was, and is my opinion that that film is obscene, and was obscene as I saw it then under the definition of obscene, that is [in] . . . section 235.00 of the Penal Law." Exhibition of an obscene film violates New York Penal Law § 235.05.[2]

---

[1] The prosecution presented no evidence that juveniles were actually present in the theater.

[2] New York Penal Law § 235.05 reads in relevant part:

"A person is guilty of obscenity when, knowing its content and character, he:

"1. Promotes, or possesses with intent to promote, any obscene material; or

"2. Produces, presents or directs an obscene performance or participates in a portion thereof which is obscene or which contributes to its obscenity.

The warrants were immediately executed by police officers. Three reels, composing a single copy of the film, were seized. Petitioner, the theater manager, was arrested, as were the projectionist and the ticket taker.[3] No pretrial motion was made for the return of the film or for its suppression as evidence. Nor did petitioner make a pretrial claim that seizure of the film prevented its exhibition by use of another copy, and the record does not conclusively indicate whether such a copy was available. On September 16, 1969, 47 days after his arrest and the seizure of the movie, petitioner came to trial, a jury having been waived, before three judges of the New York City Criminal Court.

---

"Obscenity is a class A misdemeanor."

The terms used in § 235.05 are defined by New York Penal Law § 235.00, which reads in relevant part:

"The following definitions are applicable to sections 235.05, 235.10 and 235.15:

"1. 'Obscene.' Any material or performance is 'obscene' if (a) considered as a whole, its predominant appeal is to prurient, shameful or morbid interest in nudity, sex, excretion, sadism or masochism, and (b) it goes substantially beyond customary limits of candor in describing or representing such matters, and (c) it is utterly without redeeming social value. Predominant appeal shall be judged with reference to ordinary adults unless it appears from the character of the material or the circumstances of its dissemination to be designed for children or other specially susceptible audience.

"2. 'Material' means anything tangible which is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound or in any other manner.

"3. 'Performance' means any play, motion picture, dance or other exhibition performed before an audience.

"4. 'Promote' means to manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmute, publish, distribute, circulate, disseminate, present, exhibit or advertise, or to offer or agree to do the same."

[3] The cases against the ticket taker and projectionist were dismissed on the motion of the prosecutor.

At trial, the prosecution's case rested almost solely on testimony concerning the arrests and the seizure of the film, together with the introduction into evidence of the seized film itself. The film was exhibited to the trial judges. The defense offered three "expert" witnesses: an author, a professor of sociology, and a newspaper writer. These witnesses testified that the film had social, literary, and artistic importance in illustrating "a growing and important point of view about sexual behavior" as well as providing observations "about the political and social situation in this country today. . . ." Petitioner testified that the theater's employees were instructed not to admit persons who appeared to be under 18 years of age, unless they "had identification" that they were 18. Petitioner also testified that there was a sign at the box office stating that "no one under 17 [would be] admitted." Both at the end of the prosecution's case and his own case, petitioner moved to dismiss the indictment on the ground that the seizure of the film, without a prior adversary hearing, violated the Fourteenth Amendment.

At the close of trial on September 17, 1969, petitioner was found guilty by all three judges of violating New York Penal Law § 235.05. On appeal, both the Supreme Court of the State of New York, Appellate Term, and the Court of Appeals of the State of New York viewed the film and affirmed petitioner's conviction. The Court of Appeals, relying on this Court's opinion in *Lee Art Theatre* v. *Virginia,* 392 U. S. 636, 637 (1968), held that an adversary hearing was not required prior to seizure of the film, and that the judicial determination which occurred prior to seizure in this case was constitutionally sufficient. In so holding, the Court of Appeals explicitly disapproved, as going "beyond any requirement imposed on State courts by the Supreme

Court," *Astro Cinema Corp.* v. *Mackell*, 422 F. 2d 293 (CA2 1970), and *Bethview Amusement Corp.* v. *Cahn*, 416 F. 2d 410 (CA2 1969), cert. denied, 397 U. S. 920 (1970), cases requiring an adversary hearing prior to any seizure of movie film. 29 N. Y. 2d 319, 323, 277 N. E. 2d 651, 653 (1971).

We affirm this holding of the Court of Appeals of the State of New York. This Court has never held, or even implied, that there is an absolute First or Fourteenth Amendment right to a prior adversary hearing applicable to all cases where allegedly obscene material is seized. See *Times Film Corp.* v. *Chicago*, 365 U. S. 43 (1961); *Kingsley Books, Inc.* v. *Brown*, 354 U. S. 436, 440–442 (1957). In particular, there is no such absolute right where allegedly obscene material is seized, pursuant to a warrant, to preserve the material as evidence in a criminal prosecution. In *Lee Art Theatre* v. *Virginia, supra,* the Court went so far as to suggest that it was an open question whether a judge need "have viewed the motion picture before issuing the warrant." [4] Here the judge viewed the entire film and, indeed, witnessed the alleged criminal act. It is not contested that the judge was a "neutral, detached magistrate," that he had a full opportunity for independent judi-

---

[4] "It is true that a judge may read a copy of a book in courtroom or chambers but not as easily arrange to see a motion picture there. However, we need not decide in this case whether the justice of the peace should have viewed the motion picture before issuing the warrant. The procedure under which the warrant issued solely upon the conclusory assertions of the police officer without any inquiry by the justice of the peace into the factual basis for the officer's conclusions was not a procedure 'designed to focus searchingly on the question of obscenity,' [*Marcus* v. *Search Warrant*, 367 U. S. 717], at 732, and therefore fell short of constitutional requirements demanding necessary sensitivity to freedom of expression. See *Freedman* v. *Maryland*, 380 U. S. 51, 58–59." 392 U. S., at 637.

cial determination of probable cause prior to issuing the warrant, and that he was able to "focus searchingly on the question of obscenity." See *Marcus* v. *Search Warrant,* 367 U. S. 717, 731–733 (1961). Cf. *Coolidge* v. *New Hampshire,* 403 U. S. 443, 449–453 (1971); *Giordenello* v. *United States,* 357 U. S. 480, 485–486 (1958); *Johnson* v. *United States,* 333 U. S. 10, 14–15 (1948).

In *United States* v. *Thirty-seven Photographs,* 402 U. S. 363 (1971), and *Freedman* v. *Maryland,* 380 U. S. 51 (1965), we held that "'because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid *final restraint.'*" 402 U. S., at 367, quoting 380 U. S., at 58 (emphasis added). Those cases involved, respectively, seizure of imported materials by federal customs agents and state administrative licensing of motion pictures, both civil procedures directed at absolute suppression of the materials themselves. Even in those cases, we did not require that the adversary proceeding must take place prior to *initial* seizure. Rather, it was held that a judicial determination must occur "promptly so that administrative delay does not in itself become a form of censorship."[5] *United States* v. *Thirty-seven Photographs, supra,* at 367; *Freedman* v. *Maryland,*

---

[5] We further held "(1) there must be assurance, 'by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film'; (2) '[a]ny restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution'; and (3) 'the procedure must also assure a prompt final judicial decision' to minimize the impact of possibly erroneous administrative action. [*Freedman* v *Maryland,* 380 U. S.], at 58–59." *United States* v. *Thirty-seven Photographs,* 402 U. S., at 367.

*supra,* at 57–59. See *Blount* v. *Rizzi,* 400 U. S. 410, 419–421 (1971); *Teitel Film Corp.* v. *Cusack,* 390 U. S. 139, 141–142 (1968); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70–71 (1963).

In this case, of course, the film was not subjected to any form of "final restraint," in the sense of being enjoined from exhibition or threatened with destruction. A copy of the film was temporarily detained in order to *preserve it as evidence.* There has been no showing that the seizure of a copy of the film precluded its continued exhibition. Nor, in this case, did temporary restraint in itself "become a form of censorship," even making the doubtful assumption that no other copies of the film existed. Cf. *United States* v. *Thirty-seven Photographs, supra,* at 367; *Freedman* v. *Maryland, supra,* at 57–59. A judicial determination of obscenity, following a fully adversary trial, occurred within 48 days of the temporary seizure. Petitioner made no pretrial motions seeking return of the film or challenging its seizure, nor did he request expedited judicial consideration of the obscenity issue, so it is entirely possible that a prompt judicial determination of the obscenity issue in an adversary proceeding could have been obtained if petitioner had desired.[6] Although we have refrained from establishing rigid, specific time deadlines in proceedings involving seizure of allegedly obscene material, we have definitely excluded from any consideration of "promptness" those delays caused by the choice of the defendant. See *United States* v. *Thirty-seven Photographs, supra,* at 373–374. In this case, the barrier to a prompt judicial determination of the

---

[6] The State of New York has represented that it stands ready to grant "immediate" adversary hearings on pretrial motions challenging seizures of material arguably protected by the First Amendment. No such motion was made by petitioner.

obscenity issue in an adversary proceeding was not the State, but petitioner's decision to waive pretrial motions and reserve the obscenity issue for trial. Cf. *Kingsley Books, Inc.* v. *Brown,* 354 U. S., at 439.

Petitioner's reliance on the Court's decisions in *A Quantity of Books* v. *Kansas,* 378 U. S. 205 (1964), and *Marcus* v. *Search Warrant,* 367 U. S. 717 (1961), is misplaced. Those cases concerned the seizure of large quantities of books for the sole purpose of their destruction,[7] and this Court held that, in those circumstances, a prior judicial determination of obscenity in an adversary proceeding was required to avoid "danger of abridgment of the right of the public in a free society to unobstructed circulation of nonobscene books." *A Quantity of Books* v. *Kansas, supra,* at 213. We do not disturb this holding. Courts will scrutinize any large-scale seizure of books, films, or other materials presumptively protected under the First Amendment to be certain that the requirements of *A Quantity of Books* and *Marcus* are fully met. " 'Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' " *New York Times Co.* v. *United States,* 403 U. S. 713,

---

[7] In particular, *Marcus* involved seizure by police officers acting pursuant to a general warrant of 11,000 copies of 280 publications. 367 U. S., at 723. Unlike this case, there was no independent judicial determination of obscenity by a neutral, detached magistrate, nor were the seizures made to preserve evidence for a criminal prosecution. *Id.,* at 732. The sole purpose was to seize the articles as contraband and to cause them "to be publicly destroyed, by burning or otherwise." *Id.,* at 721 n. 6. In *A Quantity of Books* v. *Kansas,* 378 U. S. 205 (1964), 1,715 copies of 31 publications were seized by a county sheriff, also without any prior judicial determination of obscenity and, again, for the sole purpose of destroying the publications as contraband. *Id.,* at 206–209.

714 (1971), quoting *Bantam Books, Inc.* v. *Sullivan,* 372 U. S., at 70; *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971); *Carroll* v. *Princess Anne,* 393 U. S. 175, 181 (1968). See *Near* v. *Minnesota,* 283 U. S. 697 (1931).

But seizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence in a criminal proceeding, particularly where, as here, there is no showing or pretrial claim that the seizure of the copy prevented continuing exhibition of the film.[8] If such a seizure is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt [9] judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party, the seizure is constitutionally permissible. In addition, on a showing to the trial court that other copies of the film are not available to the exhibitor, the court should permit the seized film to be copied so that showing can be

---

[8] In *Mishkin* v. *New York,* 383 U. S. 502 (1966), this Court refused to review the legality of a seizure of books challenged under *A Quantity of Books, supra,* primarily because the record did not reveal the number of books seized as evidence under the warrant or "whether the books seized . . . were on the threshold of dissemination." *Id.,* at 513. If *A Quantity of Books* applied to *all* seizures of obscene material, there would have been no need for the Court to abstain from review in *Mishkin,* since the parties had conceded that there was no prior adversary hearing. This is not to say that multiple copies of a single film may be seized as purely cumulative evidence, or that a State may circumvent *Marcus* or *A Quantity of Books* by incorporating, as an element of a criminal offense, the number of copies of the obscene materials involved.

[9] By "prompt," we mean the shortest period "compatible with sound judicial resolution." See *United States* v. *Thirty-seven Photographs,* 402 U. S., at 367; *Blount* v. *Rizzi,* 400 U. S. 410, 417 (1971); *Freedman* v. *Maryland,* 380 U. S. 51, at 58–59 (1965).

continued pending a judicial determination of the obscenity issue in an adversary proceeding.[10] Otherwise, the film must be returned.[11]

With such safeguards, we do not perceive that an adversary hearing *prior* to a seizure by lawful warrant would materially increase First Amendment protection. Cf. *Carroll* v. *Princess Anne, supra,* at 183–184. The necessity for a prior judicial determination of probable cause will protect against gross abuses, while the availability of a prompt judicial determination in an adversary proceeding following the seizure assures that difficult marginal cases will be fully considered in light of First Amendment guarantees, with only a minimal interference with public circulation pending litigation. The procedure used by New York in this case provides such First Amendment safeguards, while also serving the public interests in full and fair prosecution for obscenity offenses. Counsel for New York has argued that movie films tend to "disappear" if adversary hearings are afforded prior to seizure. We take judicial notice that such films may be compact, readily transported for exhibition in other jurisdictions, easily destructible, and particularly susceptible to alteration by cutting and splicing critical parts of film.

---

[10] At oral argument, counsel for petitioner agreed that a prompt opportunity to obtain a copy from the seized film at "an independent lab under circumstances that would assure that there was no tampering with the film" with the original returned within "24 hours" would "satisfy" his "First Amendment position." Tr. of Oral Arg. 28. Petitioner never requested such a copy below.

[11] Failure to permit copying of seized material adversely affects First Amendment interests; prompt copying of seized material should be permitted. If copying is denied, return of the seized material should be required. On the other hand, violations of Fourth Amendment standards would require that the seized material be excluded from evidence. See *Roaden* v. *Kentucky, post,* p. 496; *Lee Art Theatre* v. *Virginia,* 392 U. S., at 637. Cf. *Mapp* v. *Ohio,* 367 U. S. 643 (1961).

Petitioner also challenged his conviction on substantive, as opposed to procedural, ground arguing that he was convicted under standards of obscenity both overbroad and unconstitutionally vague. In addition, petitioner argues that films shown only to consenting adults in private have a particular claim to constitutional protection. In *Miller* v. *California, ante,* p. 15, and *Paris Adult Theatre I* v. *Slaton, ante,* p. 49, decided June 21, 1973, we dealt with these substantive issues. A majority of this Court has now approved guidelines for the lawful state regulation of obscene material. The judgment of the Court of Appeals of the State of New York is therefore vacated and this case remanded for the sole purpose of affording the New York courts an opportunity to reconsider these substantive issues in light of *Miller* and *Paris Adult Theatre I.* See *United States* v. *12 200-ft. Reels of Film, ante,* at 130 n. 7.

*Vacated and remanded.*

MR. JUSTICE DOUGLAS, dissenting.[*]

I would reverse outright in each of these cases as, in my view, the underlying obscenity statute violates the First Amendment for the reasons stated in my dissenting opinions in *Miller* v. *California, ante,* p. 37, and *United States* v. *12 200-ft. Reels of Film, ante,* p. 130.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, dissenting.

We granted certiorari to consider the holding of the Court of Appeals of New York that the Constitution does not require an adversary hearing on obscenity prior to a judge's issuance of warrants for the seizure of a

---

[*]This opinion applies also to No. 71–1134, *Roaden* v. *Kentucky, post,* p. 496.

film and for the arrest of the film's exhibitor. 29 N. Y. 2d 319, 277 N. E. 2d 651 (1971). The statute under which the prosecution was brought* is, in my view, unconstitutionally overbroad and therefore invalid on its face. See my dissent in *Paris Adult Theatre I* v. *Slaton, ante,* p. 73. I would therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings not inconsistent with my dissenting opinion in *Slaton.* In that circumstance, I have no occasion to consider whether, assuming that a prosecution could properly be brought, the seizure of the film at issue here was constitutional.

---

*N. Y. Penal Law § 235.05:

"A person is guilty of obscenity when, knowing its content and character, he:

"1. Promotes, or possesses with intent to promote, any obscene material; or

"2. Produces, presents or directs an obscene performance or participates in a portion thereof which is obscene or which contributes to its obscenity."