LEIGH M. CLARK, Supernumerary Circuit Judge.
Appellant was convicted of knowingly and unlawfully exhibiting an obscene motion picture film entitled “Referral Service,” which portrayed “Actual act, or acts of sexual intercourse, cunnilingus, fellatio, homosexuality between females, contrary to and in violation of Ordinance No. 67-2, Section -3 of the City of Birmingham, Alabama.” A jury fixed his punishment at a fine of $150.00, to which the court added a term of hard labor for ninety days.
The evidence, consisting chiefly of the testimony of one witness, Officer David Luker, shows that appellant was employed by the Foxy Adult Cinema as manager in *529 April 1975. The Foxy is an adult theater which shows exclusively motion picture films X-Rated for their sexual content. The general nature of the films shown in the theater is advertised on the exterior of the building. On April 10, 1975, Officer Luker visited the theater as part of his assignment as a member of the vice squad of the Police Department of Birmingham, to which squad he had been assigned since September, 1974. He paid five dollars for an admission ticket, entered the theater and viewed in its entirety a 16mm motion picture film, in sound and color, entitled “Referral Service.” The viewing time was approximately sixty minutes. During the same time, approximately 12:00 Noon, the film was viewed by between approximately fifteen and thirty male and female patrons.
After viewing the movie, Officer Luker left the theater, went to City Hall, composed a search warrant and an arrest warrant, made an affidavit, and presented himself, the affidavit, and the warrants to Honorable Joseph G. Barnard,[1] who executed the warrants. After appearing before Judge Barnard, narrating an account of his viewing the movie, and responding to questions asked him by Judge Barnard, Luker returned to the theater with the signed warrants on April 12,1975, watched enough of the movie to ascertain it was the same one he had watched the day before, obtained the film from the projectionist after showing him the search warrant, and then arrested appellant.
The major contention of appellant is that the seizure of the film was an invasion of defendant’s rights under the First, Fifth and Fourteenth Amendments to the Constitution of the United States. His premise for such contention is that Judge Barnard did not have sufficient information to warrant the issuance by him of the .search warrant. The supporting affidavit in pertinent part is as follows:
“. . . on 10 April 1975 at 12:00 P Affiant viewed a sound and color presentation entitled ‘Referral Service’ a motion picture: This film showed males and females engaged in actual sexual intercourse, fellatio and cunnilingus. Also presented in the film were scenes of the male organ in an erect state ejaculating openly in or near the mouth of a female actor. The film showed a male and female engaged in sexual intercourse on a piano bench. These scenes were presented as a series of obscene acts that had little or no relation to any plot or story. There were scenes presented in this film that had the camera focused closely on the genitals of the actors.”
On the hearing of the motion to suppress, the following testimony was given by Officer Luker, called for the purpose of the motion by defendant:
“Q State to the Court what you told Judge Bernard.
“A I told Judge Bernard that I viewed the movie Referral Service at 305 North 18th Street, Foxy Adult Cinema. I told him I viewed it at approximately the 10th of April, 1975, at around 12:00 at Noon. The movie depicted males and females engaged in sexual conduct including actual sexual intercourse, cunnilingus, fellatio, ejaculation and lewd exhibition of the genitals.
“Q Did you tell him anything else besides that?
“A Nothing other than the fact that Michael Robinson sold me a ticket to the movie and was present when I viewed it.
“THE COURT: Is that this Defendant, Michael Robinson?
“A Yes, sir.
“Q In other words, what you told Judge Bernard is what you wrote on this affidavit, is that correct?
“A Yes,' sir.
“Q And you did not go into detail scene by scene with Judge Bernard as to what the movie Referral Service contained, did you?
*530 “A No sir, I didn’t go into detail scene by scene. I think I did make reference to a scene involving an act of sexual intercourse on a piano. It had, I believe, a maroon spread over it. I’m not sure about the spread, but I know I did tell him about that scene.
“Q What I’m asking is, other than describing the type of sex acts that were being performed in this movie, you didn’t go into detail about what the movie was about, who the characters were and where they were and things of that nature?
“A No, I didn’t.
“Q And the Judge didn’t ask you questions about the various scenes in the movie and where they were and what took place, when and with whom and however, did he?
“A I don’t remember him asking me.”
On cross-examination of the witness by the City, the witness again narrated what he had seen at the movie and thereafter said:
“Q And I will ask you if you took these facts and evidence to Judge Bernard at his office at City Hall in Birmingham, Alabama and related them to him and ask you if this is an Exhibit # 1 which has been introduced into evidence, I will ask you if the top portion of this affidavit here was filled out in your own handwriting, is that correct?
“A Yes, sir.
“Q Did you present this to His Honor? “A I did.
“Q And did you swear to it and sign it in his presence?
“A Yes, sir.
“Q Did he question you at length concerning this affidavit before he signed it? “A No, sir.
“Q Did he question you about it?
“A He questioned me, yes, sir.”
A magistrate is required to focus searchingly on the question of obscenity before he issues a search warrant for the seizure of First Amendment material. Marcus v. Property Search Warrant, 367 U.S. 717, 732, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). Condemned especially in Marcus is the acceptance by a magistrate of the con-clusional statements in the affidavit upon which the warrant is issued.
We do not consider, as appellant apparently does, that the affidavit in this case consists of conclusions merely, or even substantially. They are primarily stark statements of fact. We think also that appellant is not justified in the conclusion that the magistrate did not question the affiant to obtain more information than that which was contained in the affidavit. It is true, as shown above, that the affiant did not remember that the judge questioned him about “the various scenes in the movie and where they were and what took place, when and with whom and however,” but it is clear that there was a colloquy between the magistrate and the affiant with reference to what the affiant had viewed in the particular movie. It is also clear, as shown by the affidavit, that “any plot or story” of the movie was not dependent upon, and was unrelated to the pornography that had attracted its patrons at five dollars a person. Whatever the story or the plot, it served merely as an accompaniment, as sublime music, wrested from the sublime verse it usually accompanies, does when applied to a filthy parody; which sometimes has the claimed redeeming quality of humor, although no such quality is even claimed as to the matter under consideration.
We do not doubt that at times it is necessary for a magistrate to proceed further than the examination of the affiant in this case, to preserve the First Amendment rights of persons in possession of material claimed to be obscene. In many cases more details would be necessary, the scheme is more delicately woven, the plan is more subtle, the nauseous scene more camouflaged. In this case, no more artistry is involved than in that of the hit-and-run pervert who scratches his vulgarisms upon the walls of the dirtiest public private places of the world, to vie with the surrounding putrescence from which the normal traveller as soon as possible retreats.
*531 The blatant facts, as shown here, without any further detail, enabled the magistrate to make an assessment as a whole of the production, to the extent at least of determining the existence of probable cause for believing it was illegal. The searching focus required is necessarily relative and is dependent upon the object focused upon. In this case, no telescope, no microscope, no spectacles were required.
In arguing for the proposition that the search warrant was invalid, appellant states:
“It is the appellant’s contention that the only manner in which the command of Marcus can be followed where a full length motion picture is alleged to be obscene is for the magistrate to view the movie. No other procedure can insure the required Constitutional scrutiny to this type of First Amendment material.”
After searching for a case to support appellant, he candidly admits that he has found none, other than Hess v. State, 536 P.2d 366 (Okl.Cr.1975), from which appellant quotes:
“(the defendants) . . . contend that the trial court erred in overruling the defendants’ motion to suppress the introduction of the seized film into evidence. In support of their contention the defendants argued that no magistrate viewed the film in an effort to focus searchingly upon the question of obscenity prior to the issuance of the warrant, and that, therefore, the warrant was issued in violation of the explicit guidelines set down in the recent decision of the United States Supreme Court in Heller v. New York, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973). With this contention we agree. The record reflects that the Judge issuing the search warrant did not view the film prior to the issuance of a warrant. The facts in the instant case do not present exigent circumstances wherein immediate police action must be ‘now or never’ to preserve evidence. The film complained of was not stolen or contraband and was not in the process of being removed or destroyed. The failure of a neutral magistrate to view the film prior to the issuance of a constitutionally sufficient search warrant was error. See also Roaden v. Kentucky, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757.”
We do not agree that it was necessary for the magistrate to view the film before he could issue a constitutionally sufficient warrant to authorize its seizure. We do not think that Heller v. New York, supra, so held. As to the question of any necessity for the magistrate to view the film before issuing a search warrant, the Court in Heller, 413 U.S. 488, 93 S.Ct. 2792, said:
“. . .In Lee Art Theater v. Virginia, [392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313] supra, the Court went so far as to suggest that it was an open question whether a judge need ‘have viewed the motion picture before issuing the warrant.’ . . .”
The Court also noted in Heller that “The judge viewed the entire film and, indeed, witnessed the alleged criminal act.” The Court did not hold that such viewing by the magistrate was essential to issuance by him of a valid search warrant. Nor did this Court so hold in a case in which the magistrate himself viewed the film before issuing the warrant. McKinney v. City of Birmingham, 52 Ala.App. 605, 296 So.2d 197, cert. denied, 292 Ala. 726, 296 So.2d 202, cert. denied, 420 U.S. 950, 95 S.Ct. 1335, 43 L.Ed.2d 429. Noting the fact that the magistrate had seen the film, but not deciding that it was necessary for him to have seen the film, before issuing the warrant, Judge Tyson, now Presiding Judge, speaking for a unanimous Court, said:
“Finally, we find that, since there was no request or demand by the appellant that the films in question be returned to the exhibitor to be shown pending a judicial determination on the issue of obscenity vel non, we find that such were lawfully seized as evidence in the several cases in question inasmuch as here there was a determination by a neutral and detached magistrate on the issue of obscenity prior to their seizure. . . . ”
*532 We do not say that it is never necessary for the one who issues a warrant of search and seizure to view beforehand the matter seized in order to protect one’s First Amendment rights, but to require it in every instance is to say in effect that nothing can be so obscene that no witness can possibly describe it in such a way as to present a probable cause case, when in fact it is so offensive that it may be so described by a witness as to portray its illegality beyond any rational doubt, if not beyond cavil. The protection of First Amendment rights does not require that nothing be believed unless it is seen. Such a requirement is not to be found in any field of knowledge. Furthermore, we suggest a collision between any such requirement in an inordinate desire to protect First Amendment rights and another paramount principle, i. e., the independence, the neutrality and detachment of the judicial branch of government.
A magistrate is primarily a judicial official. Whenever he becomes a witness, or an advocate, a partisan, a detective, a law enforcement officer, his true and proper role is to some extent diluted. The most noteworthy exposition on this subject is to be found in the unanimous opinion of the Supreme Court in Shadwick v. City of Tampa, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972), wherein Mr. Justice Powell said:
“An examination of the Court’s decisions reveals that the terms ‘magistrate’ and ‘judicial officer’ have been used interchangeably.
“To attempt to extract further significance from the above terminology would be both unnecessary and futile. The substance of the Constitution’s warrant requirements does not turn on the labeling of the issuing party. The warrant traditionally has represented an independent assurance that a search and arrest will not proceed without probable cause to believe that a crime has been committed and that the person or place named in the warrant is involved in the crime. Thus, the issuing magistrate must meet two tests. He must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search. This Court long has insisted that inferences of probable cause be drawn by ‘a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.’ Johnson v. United States, supra [333 U.S. 10, at 14, 68 S.Ct. 367, at 369, 92 L.Ed. 436, at 440]; Giordenello v. United States, supra [357 U.S. 480, at 486, 78 S.Ct. 1245, at 1250, 2 L.Ed.2d 1503, at 1509. . . .
“. . . Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement. There has been no showing whatever here of partiality, or affiliation of these clerks [authorized to issue arrest warrants as to misdemeanors] with prosecutors or police. The record shows no connection with any law enforcement activity or authority which would distort the independent judgment the Fourth Amendment requires. . . . ”
A magistrate should not be placed in a position of having to violate one’s Fourth Amendment rights in order to prevent a violation of his First Amendment rights. See also Annot., 32 L.Ed.2d 970.
Defendant’s motion to suppress the evidence, consisting of the film “Referral Service,” was properly overruled.
Appellant argues, as he contended to some extent, but rather tangentially, on the trial, that there was discrimination by the city of Birmingham in the prosecution of defendant in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. He relies upon Simonetti v. City of Birmingham, 55 Ala.App. 163, 314 So.2d 83 (1975) and Associated Industries of Alabama, Inc. v. State, 55 Ala.App. 277, 314 So.2d 879, cert. denied, 294 Ala. 281, 314 So.2d 901 (1975), as well as cases from other jurisdictions, including particularly the forerunner, Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The *533 only evidence to support his contention is the testimony of Officer Luker, who had been with the Vice Squad of the Birmingham Police Department about seven months at the time of his arrest of defendant. Officer Luker testified that during that time the only arrest made by him of a person engaged in showing a full length X-Rated movie, dealing in sex, was defendant, whom he arrested on more than one occasion. The evidence is not altogether satisfactory and definite on the point, which is due to a great extent to a fast-moving interrogation of the witness, but we do not understand that the witness himself viewed any full length illegal X-Rated movies at other movie houses during that time. We do not understand from his testimony that defendant was the only person arrested by any officer of the City for such activity during the stated time. Any decision that there was discrimination against defendant by the city of Birmingham would not be supported by substantial evidence, even though it may be conceded that there are some flimsy indications thereof in the evidence. The evidence does not show that the City selected the Foxy Adult Cinema as an exclusive target of prosecution. The parties agree that a heavy burden rests on a defendant to establish conscious, intentional discrimination requisite to a collision with the Equal Protection Clause of the Fourteenth Amendment. Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944); Simonetti v. City of Birmingham, supra.
The ordinance under which appellant was tried and convicted provides in pertinent part:
“Section 1. The following words and terms, when used in this ordinance, shall for the purpose of this ordinance have the meanings respectively ascribed to them by this section:
“A. ‘Obscene’ méans that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description of representation of such matters. If it appears from the character of the material or the circumstances of its dissemination that the subject matter is designed for a specially susceptible audience, predominant appeal shall be judged with reference to such audience. . . ."
In appellant’s brief, he states:
“Appellant acknowledges that the City of Birmingham has amended Section 1 of its Ordinance 67-2 to adopt the guidelines set out in Miller v. California, 413 U.S. 15 [93 S.Ct. 2607, 37 L.Ed.2d 419] (1973), in its definition of ‘obscene’. In so doing it has adopted guidelines which create in its Ordinance an overbreadth that permits them to infringe upon the publication and dissemination of Constitutionally protected materials. The Ordinance containing the Miller standards proscribing the exhibition of allegedly obscene materials opens the door for censorship of materials previously found to be entitled to First Amendment protection.”
By addressing this argument to us, we assume that appellant is seeking thereby to preserve his right to address it to the Supreme Court of the United States. At any rate, our only course is to attempt to follow, and not to overrule, higher authority. This applies not only to the majority opinion of the Supreme Court of the United States in Miller v. California, supra, but also to the majority opinion of the Supreme Court of Alabama in McKinney v. City of Birmingham, 292 Ala. 726, 296 So.2d 236, notwithstanding appellant’s earnest insistence that we follow dissenting opinions, rather than the opinion of the Court, in the one, and a dissenting opinion,[2] rather than the opinion of the Court, in the other.
*534 The writer of this opinion and the judges of this Court have witnessed a projected view of the film made the basis of the prosecution. To say that its “predominant appeal . . . is to prurient interests, i. e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation” is a gross understatement. Such could have been its only appeal to those under no duty to see the picture. It descends to the nadir of repulsiveness.
We find the verdict and judgment amply supported by the evidence and that the record shows no error prejudicial to appellant.
The judgment appealed from should be affirmed.
The foregoing opinion was prepared by the Honorable Leigh M. Clark, a retired Circuit Judge, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur.

. Then a judge of the city of Birmingham — now Circuit Judge Joseph G. Barnard of the Tenth Judicial Circuit.

. Wherein, notwithstanding the Court’s rejection of the position taken therein that the particular ordinance then and now under consideration, as well as Code of Alabama 1940, as amended, Tit. 14, Chs. 64A and 64C, conflicts with the Constitution of Alabama, Art. 1, § 4, there is a greatly needed reminder of the enshrinement of liberties in state constitutions, as *534 well as in the Constitution of the United States. The scholarly dissenting opinion of Mr. Justice Jones is a clarion call to a greater recognition of the province of the states, and the responsibility of state courts, in this respect. Lest we forget, state constitutions embraced bills of rights before there was a Constitution of the United States. See also Howard, State Courts and Constitutional Rights in the Day of the Burger Court, 62 Virginia Law Review 873.