**UNITED STATES, Appellee,**

v.

**Specialist Five Wendell D. CUFFEE, SSN 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, United States Army, Appellant.**

**CM 438107.**

U. S. Army Court of Military Review.

28 Dec. 1979.

Colonel Edward S. Adamkewicz, Jr., JAGC, Major Benjamin A. Sims, JAGC, Major D. David Hostler, JAGC, Captain James J. Parwulski, JAGC, and Captain Jan W. Serene, JAGC, were on the pleadings for appellant.

Lieutenant Colonel R. R. Boller, JAGC, Major David McNeill, Jr., JAGC, Captain Harry J. Gruchala, JAGC, and Captain Rolland S. Roup, JAGC, were on the pleadings for appellee.

Before JONES, CLAUSE and LEWIS, Appellate Military Judges.

## OPINION OF THE COURT

JONES, Senior Judge:

The appellant was convicted of violating a regulation by possessing drug paraphernalia, possessing heroin, and selling heroin in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934. The court with members sentenced him to a dishonorable discharge, forfeiture of all pay and allowances, reduction to Private E–1, and confinement at hard

labor for twelve years. The convening authority reduced the confinement to six years, approving the remainder of the sentence as adjudged.

In our review of this case pursuant to Article 66, UCMJ, 10 U.S.C. § 866, we are confronted with questions of: (a) whether the evidence established that the commander who authorized the search remained neutral and detached throughout the process, notwithstanding his presence at the scene of the search; (b) whether the military judge erred in not instructing the court that the Government must prove that appellant was not within the exceptions in the regulation prohibiting possession of drug paraphernalia; and (c) whether the trial counsel impermissibly commented upon appellant's right to remain silent.

I

Using an informant, Army criminal investigators in Germany set up a controlled buy of heroin from appellant in the latter's barracks. The investigators informed the unit commander of the plan and brought him to the scene. The commander and one of the investigators watched from afar while two other investigators controlled the operation. After the informant made the buy and reported back to the controlling investigators, the investigators relayed the information to the commander and requested authority to search. The commander authorized the search of appellant's room.[1]

The commander proceeded to appellant's room in the barracks with the investigators. They entered. The investigators apprehended appellant, searched his person and the room, found heroin in a desk drawer and in his wall locker and found a syringe with needle also in the locker.

In testifying on the motion to suppress the evidence found in the search, the commander described his involvement in the

---

1. The appellant argues lack of probable cause for the search, pointing primarily to the unreliability of the informant. We agree that the informant was a questionable character who was then under charges and who was subsequently dropped as an informer because of other offenses, but the facts amply support his reliability in this case. The buy was extremely well-controlled, his testimony was supported by other witnesses, and the appellant's story was unbelievable. We are satisfied there was probable cause to authorize the search.

controlled buy and search in terms of ". . . we decided our game plan, how it was going to work . . ."; and in response to the question "[D]id you go into the room to participate in the search at all?", responded "Yes, sir, I did." Thus, from the commander's characterization of his activities, it would appear that he abandoned his neutral and detached judicial role and engaged in the business of gathering evidence.

In *United States v. Ezell*, 6 M.J. 307 (C.M.A. 1979), the Court of Military Appeals discussed at length the commander's role in the search process and how that role related to the Fourth Amendment. The Court declined to hold that a company commander was disqualified *per se* from being able to exercise a judicial function. In recognizing the many functions of a military commander and the absence of any parallel official in the civilian community, the Court stated:

> "Indeed, no official in the civilian community having similarly combined functions could qualify as a neutral and detached magistrate under Fourth Amendment jurisprudence. (citations omitted.)" 6 M.J. at 318.[2]

However, the Court went on to emphasize that:

> "We have recognized that the military commander is capable of neutrality when he is not actively involved in the investigative or prosecutorial functions which are otherwise clearly within the perimeters of command authority. . . .
> We have also held that, when the military commander becomes personally involved as an active participant in the gathering of evidence or otherwise demonstrates personal bias or involvement in the investigative or prosecutorial process against the accused, that commander is devoid of neutrality and cannot validly perform

. . . [his judicial] functions . . ." 6 M.J. at 318, 319.

The commander's judicial role sometimes conflicts with his responsibility for maintaining order and discipline. The line of demarcation between the two functions often blurs, making it difficult to determine which role he is performing, especially in questions regarding search and seizure. Recognizing this problem, the Court in *Ezell* announced the following guidance:

> "Finally, we consider that anyone present during the search is engaged in law-enforcement activities, so we expect that the commander will not be present at the scene of the search. Presence would indicate to us that the commander has been engaged in law-enforcement activities throughout his participation in the entire authorization process, except in very extraordinary situations . . . ." 6 M.J. at 319.

This rule does not say that a commander's subsequent presence at a search will invalidate what was initially a neutral judicial decision, for the commander's role became fixed at the time of decision. Rather, the rule states that when we are trying to determine the commander's status at the decision-making time, we must consider the commander's subsequent actions as a reflection of his prior status.

The rule quoted above establishes a presumption against neutrality which arises from the commander's presence at the scene of a search. That presumption is rebuttable and we think it was rebutted here. The commander was acting in a neutral judicial role at the time he authorized the search, as evidenced by the factors listed below.

First, the plan for the controlled buy was devised and executed by the criminal investigators. They made the decision to set up the buy, used their informant and money,

2. One of the difficulties in the search and seizure area stems from a persistence in using the term "neutral and detached magistrate" in describing a commander when he exercises his judicial role. That term has a special meaning in constitutional law that admittedly cannot be applied directly to the military commander, for as Judge O'Donnell said in *United States v. Withers*, 2 M.J. 520 (A.C.M.R. 1976), "he is certainly no magistrate and generally has little if any detachment in the matter." *See also* Judge Fletcher's comment in this regard in his concurring opinion in *United States v. Ezell*, 6 M.J. 307, 326 (C.M.A. 1979).

performed the pre-buy search and received the post-buy report. They brought the commander into the procedure at the last minute in deference to his position as commander and in order to have him nearby for the purpose of seeking search authorization.[3]

Second, the commander's personal observations, which he considered in making his probable cause determination for authorizing the search, did not disqualify him from exercising a judicial role. *See Heller v. New York*, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973).

Finally, the apprehension and search were conducted solely by the investigators. The commander searched nothing and seized nothing. He merely observed the procedures occurring in the barracks and affecting the personnel of his command. Notwithstanding his inflated description of his activity, there is not one bit of evidence that he actively participated in the investigative, evidence-gathering enterprise. He neither approved nor directed the use of the informant, the surveillance, the buy, or the search. There was no telescoping here of the process of application for authority to search, issuance of the authorization, and execution of the search as proved fatal in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979). Here the evidence established that he only

observed the proceedings, thereby rebutting the presumption that he was engaged in law enforcement activities throughout. Accordingly, the evidence was properly admitted.

II

■ The appellant was convicted of violating paragraph 33, USAREUR Regulation 632–10, by possessing a hypodermic syringe with hypodermic needle. The regulation provides as follows:

"Except in the course of official duty or pursuant to a valid prescription, personnel will not possess a hypodermic syringe with a hypodermic needle or any other device constructed in such a manner as to permit its use as a means of injecting a liquid substance into or through the tissues of the body."

The regulation contains two exceptions (to cover doctors and diabetics, for example) and there is no violation unless the possession is outside those exceptions. As part of its proof, the prosecution must establish that the accused's possession was not within the exception.[4] *United States v. Verdi*, 5 M.J. 330 (C.M.A. 1978); *United States v. Woods*, 7 M.J. 750 (A.C.M.R. 1979), certified to U.S.C.M.A. 1 June 1979. *See also United States v. Meckler*, 6 M.J. 779 (A.C.M.R. 1978). Similarly, the judge must instruct the court members of the prosecution's burden. *United States v. Verdi, supra.*

---

3. We judicially note the long standing practice in the military whereby investigators, inspectors, official visitors, and others communicate with or personally contact the commander of an installation or organization before proceeding with official activity affecting the installation or organization. It is not unusual for the commander or his representative to accompany the official intruders. Only in exceptional circumstances would an activity such as the controlled buy and search here be accomplished without the commander's notice.

4. The dissent in footnote 3 quotes from 21 U.S.C. § 885(a)(1) to marshal analogous support for his views from the federal statutory scheme proscribing illicit drug possession and transactions. First, it might be observed that Congress deemed it necessary to expressly address the issue of pleading and proving exemptions and exceptions and placing the burden of going forward with evidence of such upon the person so claiming. While Congress might oc-

casionally enact such a provision, not regarding it as essential but merely out of an over-abundance of caution, the presumption under conventional rules of statutory construction is that each legislative section has an intended purpose and is not surplusage. Section 885 is captioned "Burden of proof, liabilities" and in four sub-sections explicitly apportions various burdens and presumptions in addition to that quoted by the dissent. The USAREUR regulation under consideration here contains no similar sections reflecting an intention to apportion burdens in any manner similar to the intent of Congress in the 1970 Federal Drug Abuse Act. Accordingly, we remain constrained to regard it as the prosecution's ab initio burden to place the accused's conduct within the regulation's proscription. Inasmuch as its exception is incorporated in its enacting clause, conduct is not proscribed unless it is outside the provision's exception.

714

In the instant case the prosecution failed to prove that appellant's possession was outside the exceptions and the military judge failed to instruct the members as to the government's burden in that regard.[5] The exceptions were totally ignored. The prosecution's lapse was probably saved by the appellant who, in testifying in his own defense, related events from which it could be concluded beyond a reasonable doubt that he was not within the exceptions. The lack of instruction by the military judge, however, was not remedied. That lapse was fatal to the findings of guilty of that offense.

III

The appellant took the stand in his defense and claimed his innocence of all offenses. He denied any sale of heroin to the informant, explaining that the informant came to his room only to repay an $80.00 debt. The four marked $20.00 bills found in the search of his locker were evidence, he claimed, of that repayment. As to the heroin and paraphernalia, appellant stated that the informant planted those and left.

On cross-examination, the trial counsel asked appellant why he hadn't given that explanation to the investigators at the time of the search. He also asked appellant if he had been asked to make a statement. This questioning amounted to a comment on appellant's right to remain silent and was error, as the Government concedes. *United States v. Noel*, 3 M.J. 328 (C.M.A. 1977); *United States v. Moore*, 1 M.J. 390 (C.M.A. 1976). In view of the incredibility of appellant's story and the overwhelming evidence against him, however, we are convinced that the error was harmless beyond a reasonable doubt. *United States v. Moore, supra; United States v. Ward*, 1 M.J. 176 (C.M.A. 1975).

5. Proof that appellant did not possess the paraphernalia during the course of his official duties or pursuant to a prescription probably could have been established through the testimony of the unit commander who was present and testified on other matters.

The only corrective action that must be taken concerns Charge I (violation of a regulation). Although a rehearing would be permissible, we see no need to prolong the litigation in this case in view of the relative seriousness of that offense compared to the sale and possession offenses. Therefore, we will dismiss that charge.

The findings of guilty of Charge I and its specification are set aside and that charge is dismissed. The remaining findings of guilty are affirmed. Only so much of the sentence is affirmed as provides for a dishonorable discharge, forfeiture of all pay and allowances, reduction to Private E–1, and confinement at hard labor for four years.

Judge LEWIS concurs.

CLAUSE, Judge (concurring in part/dissenting in part):

I concur with the majority opinion save that portion concerning Charge I and its specification. I find the majority's view of *United States v. Verdi*, 5 M.J. 330 (C.M.A. 1978), to be overbroad and I would limit that opinion to its specific facts.

The regulation under consideration in *Verdi* prohibited the wearing of wigs or hairpieces "while on duty or in uniform except for cosmetic reasons to cover natural baldness or physical disfiguration." It is clearly stated in the Court's opinion that where exceptions are contained within a criminal statute or regulation, the jury must be instructed that the burden of proof is upon the prosecution to prove that the accused does not fall within the exceptions.[1] Principal support for the new rule was placed on the Court's interpretation of the United States Supreme Court opinion in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *United States v. Vuitch*, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971).

1. Affirmative defenses which do not appear in the statute or regulation were distinguished. The Government does not have the initial burden to negative those affirmative defenses.

It is a recognized legal principle that the burden is generally on the defendant seeking the benefit of an exception to raise the issue, and that the Government need not negative an exception until the issue is presented.[2] It finds support in *Morrison v. California*, 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664 (1934), which was relied upon by the United States Court of Military Appeals in *United States v. Gohagen*, 2 U.S.C.M.A. 175, 7 C.M.R. 51 (1953). The fact that this principle is well established in military law is adequately documented by Judge Cook in his dissent in *Verdi* and need not be repeated here. This principle is most often utilized in drug cases because regulations and statutes in this area generally provide for legitimate medical exceptions. The principle is incorporated by statute in the 1970 Federal Drug Abuse Act.[3] The constitutionality of this provision has withstood attack even after *Vuitch* and *In re Winship*.[4] Contrary to the conclusion in *Verdi*, I believe this general principle is still alive and healthy. A close examination of the two Supreme Court decisions relied upon in *Verdi* for establishing a new rule demonstrates why this is so.

*In re Winship*, a 1970 decision, is principally known for invalidating a state statutory provision which permitted a determination of juvenile delinquency on a preponderance of evidence bases. The Court in defining the issue stated:

This case presents the single, narrow question whether proof beyond a reasonable doubt is among the "essentials of due

process and fair treatment" required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult.

After an exhaustive review of prior cases involving the standard of proof necessary for criminal conviction, the Court stated in summary:

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

The Court then turned to the issue of whether juveniles, like adults, are constitutionally entitled to proof beyond a reasonable doubt when they are charged with violation of a criminal law. What is important to note from this case is that the excerpt which was quoted in *Verdi* constituted only a recitation of what was accepted legal principle at that time with respect to adults. There was no other consideration by the Court of principles of statutory interpretation or adequacy of proof and I do not believe that the opinion establishes any new rule other than the one announced by the Court as the narrow issue in question.

The more difficult case to understand is *United States v. Vuitch*, which was relied upon in *Verdi* for the conclusion that an exception incorporated within a statute be-

2. *United States v. Rowlette*, 397 F.2d 475 (1968); *see also McKelvey v. United States*, 260 U.S. 353, 357, 43 S.Ct. 132, 67 L.Ed. 301 (1922). ALI Model Penal Code Sec. 1.12 (1962).

3. 21 U.S.C. § 885(a)(1) provides:
It shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter in any complaint, information, indictment, or other pleading or in any trial, hearing, or other proceeding under this subchapter, and the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefit.

4. *See United States v. Black*, 512 F.2d 864 (1975) (this case demonstrates how the

Government's own evidence may be sufficient to raise the exception and thus require that the Government negative the exception beyond a reasonable doubt); *United States v. Benish*, 389 F.Supp. 557, *affirmed* 523 F.2d 1050, *certiorari denied*, 424 U.S. 854, 96 S.Ct. 1428, 47 L.Ed.2d 359; *Gray v. United States*, 430 F.Supp. 399 (1977); *United States v. Miranda*, 494 F.2d 783 (1974), *cert. denied*, 419 U.S. 966, 95 S.Ct. 228, 42 L.Ed.2d 181 (1974) (concerns failure to instruct as to exceptions where defendant did not introduce evidence placing him within exception to 21 U.S.C.A. § 841(a)(1)); *United States v. Ramzy*, 446 F.2d 1184, *cert. denied*, 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 544 (1971); *United States v. Collier*, 478 F.2d 268 (1973).

comes an element of the offense requiring Government proof beyond a reasonable doubt that the exception does not apply. *Vuitch* concerned the alleged violation of D.C.Code Ann. § 22–201, which prohibited abortions "unless the same were done as necessary for the preservation of the mother's life or health and under the direction of a competent licensed practitioner of medicine." The District Judge dismissed the indictments on the grounds that the abortion statute was unconstitutionally vague. A direct appeal to the Supreme Court was filed by the Government under the Criminal Appeals Act, 18 U.S.C. Sec. 3731. The principal concern of the Court was whether they should consider the case on direct appeal.[5] After disposing of this issue the Court concluded that the statute in question was not unconstitutionally vague. In reaching its result the Court discussed the conclusions of the District Judge that the statute placed the burden of persuasion on the defendant once the fact of an abortion has been proved. Noting the "general guide to the interpretation of criminal statutes that when an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception", the Court proceeded to examine the statute in question. The opinion states:

> . . . . When Congress passed the District of Columbia abortion law in 1901 and amended it in 1953, it expressly authorized physicians to perform such abortions as are necessary to preserve the

mother's 'life or health.' Because abortions were authorized only in more restrictive circumstances under previous D.C. law, the change must represent a judgment by Congress that it is desirable that women be able to obtain abortions needed for the preservation of their lives or health. It would be highly anomalous for a legislature to authorize abortions necessary for life or health and then to demand that a doctor, upon pain of one to ten years' imprisonment, bear the burden of proving that an abortion he performed fell within that category. Placing such a burden of proof on a doctor would be peculiarly inconsistent with society's notions of the responsibilities of the medical profession. Generally, doctors are encouraged by society's expectations, by the strictures of malpractice law and by their own professional standards to give their patients such treatment as is necessary to preserve their health. We are unable to believe that Congress intended that a physician be required to prove his innocence. We therefore hold that under D.C.Code Ann. § 22–201, the burden is on the prosecution to plead and prove that an abortion was not 'necessary for the preservation of the mother's life or health.'

It seems clear from the foregoing language that the Court based its conclusion on the intent of Congress as to the elements of the offense and did not intend to establish a per se rule or a new principle of pleading or proof.[6] The opinion is almost exclusively

---

**5.** I believe it is significant that this case preceded several other pending cases concerning the legality of abortion statutes most of which were declared unconstitutional in the subsequent decision of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Court was unwilling to reach that ultimate issue in the instant case which accounted for much of the dissention.

Justice Blackmun noted that:

The five Justices constituting the majority, . . . . are divided on the merits. One feels that the D.C.Code Ann. Sec. 22–201 (1967) lacks the requirements of procedural due process and would affirm the dismissal of the indictments. One would hold that a licensed physician is immune from charge under the statute. Three would hold that properly con-

strued, the statute is not unconstitutionally vague and the dismissal of the indictments on that ground was error.

**6.** In the subsequent case of *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), also involving an exception, the Court in note 9, page 551, 95 S.Ct. page 714, note 9, assumed arguendo that the government had the burden of proving a statutory exception and concluded they had carried this burden, and thus stated they did not have to consider "whether the exception must be pleaded and proved by criminal defendants." This language supports the argument that the Court did not consider *Vuitch* as having settled the issue for all cases, but rather looks to the intent and nature of the exception to determine whether it must be pleaded and proved.

cited for the proposition that statutes should be construed, whenever possible, so as to uphold their constitutionality. I believe *In re Winship*, and *Vuitch*, which were not new cases at the time of *Verdi*, and which dealt with the emotional questions of abortion and juvenile rights, should be limited to their principal holdings. I do not consider that they mandate the conclusion reached in *Verdi*.

Two additional Supreme Court cases which have been cited on this issue are *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

The statute under review in *Mullaney* was found to be deficient because it placed on the defendant rather than the Government the "burden of persuasion" with respect to the crucial factor distinguishing murder from manslaughter. This burden was clearly an integral part of the statute under consideration. This is substantially different from the rule which requires the defendant to raise an exception or special defense, which then activates the government's burden of proof beyond a reasonable doubt as to the non-existence of the exception or defense.

In *Patterson*, the Court had occasion to consider the impact of its decision in *Mullaney*. Some argue that the two cases are in direct conflict. Regardless of the position one takes on these two cases, I believe they involve a more substantial issue than was under consideration in *Verdi*. In *Patterson* the Court stated:

*Mullaney's* holding, it is argued, is that the State may not permit the blameworthiness of an act or the severity of punishment authorized for its commission to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt. In our view the *Mullaney* holding should not be so broadly read. The concurrence of two Justices in *Mullaney* was necessarily contrary to such a reading; and a majority of the Court

refused to so understand and apply *Mullaney* when *Rivera* was dismissed for want of a substantial federal question. [8] *Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense. This is true even though the State's practice, as in Maine, had been traditionally to the contrary. Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.

(*Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281, 294–295.)

*Mullaney* and *Patterson* concern a fundamental issue of whether elements of an offense itself can be shifted from the requirement of proof by the Government to the defendant. They do not address the situation where an offense is made out under the statute without regard to any exceptions contained within the statute or regulation. The requirement for the defendant to present some evidence prior to requiring the Government to proceed to negative the exception beyond a reasonable doubt is in the nature of a special or affirmative defense. It does not change the burden of proof or the degree of proof. Some exceptions require proof by the Government of their non-existence because it is clear that the so-called exception is an integral part of the offense itself.

I believe the *Verdi* decision confused the burden of persuasion with the burden of presenting some evidence to raise an exception. This results in the Court's language to the effect that all exceptions stated in a statute or regulation constitute elements of the offense which require proof by the Government beyond a reasonable doubt. I suggest that while this may be required in some cases, it is not a general rule as suggested in *Verdi* and in fact, the exceptions stated in the regulation in question do not qualify as elements of the offense. They

are in the nature of special defenses which the law generally recognizes as placing no unconstitutional burden upon the defendant by requiring that he present some evidence to raise.

As was stated at the outset, I believe the opinion in *Verdi* to be overbroad. The majority recognized that the exception was in fact raised in that case and consequently I would limit its holding to an application of existing law rather than as establishing a new rule for the military. This position was generally adopted by the United States Navy Court of Military Review in *United*

States v. Acosta, 6 M.J. 992 (N.C.M.R. 1979),[7] and *United States v. Brinkley*, 7 M.J. 588 (N.C.M.R. 1979).[8] I believe this view to be a preferable one to that taken in *United States v. Woods*, 7 M.J. 750 (A.C.M.R. 1979). I would affirm Charge I and its specification.

---

**7.** It is interesting to note that *Acosta* contained two issues, the legality of a search and the failure of the government to prove the exceptions to its drug regulation. The Court of Review specifically refused to follow the dicta in *Verdi*. On petition, the United States Court of Military Appeals granted review on the search issue only.

**8.** *See also Off The Record*, 1 November 1978.