Janae KINGSTON dba Movie
Buffs, Plaintiff,

v.

UTAH COUNTY, Carlyle K. Bryson,
David Bateman, John Does I–X,
Defendants.

Civil No. 96–C–937G.

United States District Court,
D. Utah,
Central Division.

Dec. 9, 1996.

Jerome H. Mooney, Salt Lake City, UT, for Plaintiff.

Peter Stirba, Salt Lake City, UT, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

J. THOMAS GREENE, District Judge.

This matter came for hearing before the court on plaintiff's motion for preliminary injunction to restrain Utah County from filing criminal obscenity charges against plaintiff based upon videotapes and materials seized pursuant to a search warrant. Plaintiff was represented by Jerome H. Mooney and defendants were represented by Peter Stirba. The parties had appeared previously and defendants agreed to maintain the status quo and not file criminal charges pending a

hearing which this court set for November 22 1996, continued to November 27, 1996, at the joint request of counsel. Extensive memorandums of law have been submitted by both sides, and evidence was presented by both sides at the hearing. Following the evidentiary hearing and argument of counsel, the court took the matter under advisement.

## FACTUAL BACKGROUND

On October 9, 1996, defendant Carlyle Bryson, County Attorney of Utah County, State of Utah, received information from a concerned citizen to the effect that sexually explicit and believed to be pornographic video movies were being rented to the general public at locations in American Fork and Lehi—two cities within Utah County—at places of business operating under the name of "Movie Buffs." Thereafter, County Attorney Bryson directed peace officers to investigate by viewing the premises and renting some videos from each place in order to review the content for possible violation of Utah's pornography statutes.[1] This was done on October 17, 1996, by an officer entering a room marked "Adults Only" at each place of business. In each of the separate rooms the officer "perused the videos and their content information" as set forth on the cardboard jackets relating to each video. The officer observed that

some contained markings such as "XXX Adults Only Must Be Over 18 To View This Tape." Others did not contain such

information, or any information, or contained a home-style printed label without rating information.[2]

Officer Smith selected a video for rental from the American Fork location entitled: "The Anals of History" and from the Lehi location entitled "Butt Busters."

The aforesaid videos were delivered to the Utah County Attorney's office where they were viewed. The Utah County Attorney requested another peace officer to rent other videos for evaluation. This was done on October 20, 1996, by selection of videos from the American Fork store entitled: "Buttsisters Do the Twin Cities" and "Sticky Lips." These videos were likewise taken to the County Attorney's office where they were referred to a law enforcement investigative specialist who viewed and evaluated them. The investigator found the videos to contain obscene, graphic displays of sexual conduct believed to violate Utah's pornography statutes based upon Utah County community standards. The County Attorney was told by the police officers who viewed the premises that virtually all of the movies in the "Adults Only" areas appeared to be sexually explicit and pornographic.

The sexually explicit cardboard jacket relating to the video "Buttsisters Do the Twin Cities" had a sticker affixed which said "Cable Version,"[3] but the video itself was sexually explicit and apparently unedited.[4]

---

1. The Utah statute provides that material is pornographic if:

   (a) The average person, applying contemporary community standards, finds that, taken as a whole, it appeals to prurient interest in sex;
   (b) It is patently offensive in the description or depiction of nudity, sexual conduct, sexual excitement, sado-masochistic abuse, or excretion; and
   (c) Taken as a whole it does not have serious literary, artistic, political or scientific value. Utah Code Ann. 76–10–1203: This statute was held to be constitutional in *State v. Phillips*, 540 P.2d 936 (Utah 1975).

2. Affidavit of peace officer Gordon Smith dated 10/25/96.

3. The manager of the American Fork "Movie Buffs" store testified that "Cable Version" tapes are edited so as not to show penetration.

4. Notwithstanding the "Cable Version" sticker, the jacket of this video introduced as Exhibit 6 at the hearing shows graphic pictures of anal intercourse, male penis ejaculating into female's mouth and several other totally explicit sexual scenes. Officer Smith describes this video in an affidavit presented to the magistrate as follows:

   I reviewed the content of the movie/video entitled, "Buttsisters do the Twin Cities," and found it to contain explicit, and graphic, displays of sexual conduct between males and females, females and females, and single female masturbation. Specifically, the sexual acts shown in the video included: sexual intercourse, cunnilingus, fellatio, and female masturbation. This movie/video contained a minuscule story line, among the various scenes of sexual conduct, in which the female actors are members of a female football team, and are in the twin cities, preparing for a football game.

On October 25, 1996, peace officer Gordon Smith presented the matter, including an Affidavit in Support of Request for Search Warrant, to Magistrate Judge Backlund in Utah County. The affidavit set forth in graphic and descriptive detail the sexually explicit conduct contained in the four videos which had been rented by the peace officers.[5] The affidavit also set forth the police officer's observation that the apparent content of other movies/videos being rented or sold from the "Adults Only" rooms within the premises of "Movie Buffs" was pornographic and evidenced violation of Utah law against distribution of pornographic material.[6]

On the basis of the presentation made, the magistrate found probable cause that property was being used to commit an offense, constituting illegal conduct in violation of Utah law. A search warrant was issued which directed peace officers to search specifically described areas at each "Movie Buffs" location for evidence of the distribution or conspiracy to distribute videos in violation of Utah's law prohibiting such, with the following restrictions:

1. Only specifically described areas were to be searched, and in particular the "Adults Only" rooms.

2. One copy only of any movie/video could be seized.

3. Videos with jackets containing markings such as "M" [Mature], "XXX" or language which conveys "Adult Only Viewing," "Adults Only," "Must Be 18 Years or Older to View This Video" or any combination thereof were to be seized.

4. Videos which did not bear a movie rating as granted by the Academy of Motion Picture Sciences of Hollywood were to be seized.

5. The search and authorized seizure was limited to videos which might evidence the distribution of pornographic materials.[7]

5. In addition to the aforesaid description of "Buttsisters Do the Twin Cities," Officer Smith described the additional three videotapes in his affidavit as follows:

That I reviewed the content of the movie/video entitled, "Butt Busters," and found it to also contain explicit, and graphic, displays of sexual conduct between males and females, females and females, and group sex situations. Specifically, the sexual acts shown in the video included: sexual intercourse, apparent anal intercourse, cunnilingus, and fellatio. In this video was portrayed the use of a prosthetic sexual device commonly called a "dildo," twice by females. This movie/video contains a minuscule story line in which three struggling "financial consultants" become "happiness investment consultants" (male prostitutes) whose four female clients are simply interested in sexual activity, specifically, anal intercourse.

That I reviewed the content of the movie/video entitled "Sticky Lips," and found it to also contain explicit, and graphic, displays of sexual conduct between males and females, females and females, and group sex situations. Specifically, the sexual acts shown in the video included: sexual intercourse, apparent anal intercourse, cunnilingus, and fellatio, or a combination of these acts performed simultaneously. This movie/video also portrayed the shared use of a prosthetic sexual devise, (sic) "dildo," among females. This movie/video contained a minor story line, among the various scenes of sexual conduct, in which the director of the sexual scenes was becoming frustrated with his work in the direction of pornographic movies, and hoping to move into a director's position with a major Hollywood type organization.

That I reviewed the content of the movie/video entitled "The Anals of History," and found it to also contain explicit, and graphic, displays of sexual conduct between males and females, females and females, and group sex situations. Specifically, the sexual acts shown in the video included: sexual intercourse, apparent anal intercourse, cunnilingus, and fellatio, or a combination of these acts performed simultaneously. This movie/video contained no story line, but was simply different actors, portraying themselves as persons from various time periods through history (caveman to contemporary times), and the sexual acts performed among persons during that historical period.

6. Officer Smith described the rest of the videos as follows:

That based upon your Affiant's personal observation of Movie Buffs' Lehi and American fork store's separate adult movie/video collection rooms, the amount of movies/videos contained in each room, and the apparent content of the movies/videos being rented or sold by Movie Buffs, violations of Section 76–10–1204, Utah Code Annotated, Distributing Pornographic Material, are currently occurring at both Movie Buff stores in Utah County.

7. Specific reference in the warrant was made to Section 76–16–1204, "Distribution of Pornographic Material," which would exclude non-sexually oriented materials inappropriate for non-adult viewing, such as violence, horror movies, witchcraft, profanity, etc.

The warrant was executed and a search was conducted at both locations on October 25, 1996 which according to testimony resulted in seizure of 829 videos and 135 empty video jackets.[8] Some videos from each "Adults Only" room were not seized because the jackets or cases relating to them did not appear to be sexually oriented, and about 150 videos, mostly taken from the Lehi store, were returned when discovered not to so relate or were determined to be of no evidentiary value or not germane.

The search warrant also directed search of the area "on top of cashier/front counter" where rental videos are returned. One video, "Shooting Star," was found in plain view on top of the counter in a sexually explicit jacket (rather than the transparent jacket normally used) directly in the custody of or in proximity to an employee there who was a minor, seventeen years of age. That video and the jacket were seized by a searching officer.

The search warrant also directed seizure of records of "any rental or sale" of videos described, as well as "documents or information" regarding the "purchase, order or delivery" of the said videos. "Movie Buffs" was determined to be a business owned by plaintiff Janae Kingston, doing business under that name.

Testimony at the preliminary injunction hearing by Larry Peterman, the General Manager of "Movie Buffs," was that "Movie Buffs" does not purchase X rated videos from suppliers, but only copies edited for cable viewing which are marked with a label "Cable Version." He testified that the company relied upon suppliers to provide cable versions only, not the "hot" unedited versions. He further testified, however, that he had become aware and "sure" that some of the videos for rent at American Fork and Lehi showed vaginal intercourse, fellatio, cunnilingus and explicit pictures of female and male genitalia. He said that some videos had been placed in the "Adults Only" room, non sexual in nature, because they constituted adult-type material not appropriate for viewing by minors.[9]

Mr. Peterman testified that since the search warrant was executed on October 25, 1996, revenues fell below what otherwise would have been expected, and that the video rental market "is highly competitive." He further testified that rental revenues are seasonal and for that reason should have increased "slightly" this time of year during the month following the search. He didn't think that an increase in overall revenues of the "Movie Buffs" stores of over $200,000, or 15% during the month, would have occurred despite the search warrant as a result of seasonal upsurge. But he offered no explanation if such an increase had occurred. The rule requiring exclusion of witnesses was invoked at the commencement of the hearing. Movie Buffs' Operations Manager, Laura Shupe, testified immediately before Mr. Peterman took the stand that gross sales in the Utah stores didn't meet expectations during the month immediately after the warrant was executed, but also testified that there had been a "significant" overall increase in rental revenue, in excess of $200,000, which she attributed to expected seasonal variables.

None of the witnesses called by Movie Buffs were aware of any request or notice given or directed to be given on behalf of plaintiff to trigger the procedures under Utah law which provide for an immediate judicial probable cause hearing concerning alleged obscenity of seized materials. That law requires such a hearing upon request within 7 days. It also requires that a copy of any film seized may be obtained by the claimant, and provides for a prompt judicial ruling, as follows:

> In the event that a search warrant is issued and material alleged to be pornographic is seized under the provisions of this section, any person claiming to be in possession of this material or claiming ownership of it at the time of its seizure

---

**8.** The inventory submitted as required by Utah law listed titles of 509 videos from the American Fork store and 514 from the Lehi store. 150 or so of those were empty boxes of videos which were out for rent.

**9.** Mr. Peterman described such non sexual materials as horror jarma, witchcraft, Texas Chain Saw, Virtual Encounters, Faces of Death and other "shock" themes.

may file a notice in writing with the magistrate within 10 days after the date of the seizure, alleging that the material is not pornographic. The magistrate shall set a hearing within seven days after the filing of this notice, or at such other time as the claimant might agree. At this hearing, evidence may be presented as to whether there is probable cause to believe the material seized is pornographic, and at the conclusion of the hearing the magistrate shall make a further determination of whether probable cause exists to believe that the material is pornographic. A decision as to whether there is probable cause to believe the seized materials is pornographic shall be rendered by the court within two days after the conclusion of the hearing. If at the hearing the magistrate finds that no probable cause exists to believe that the material is pornographic, then the material shall be returned to the person from whom it was seized. *If the materials seized is a film, and the claimant demonstrates that no other copy of the film is available to him, the court shall allow the film to be copied at the claimant's expense pending the hearing.*

Utah Code Ann. 76–10–1212(3) (emphasis added). It was apparent at the hearing that the availability of the procedures described was well known to counsel for Movie Buffs, that the procedures purposely were not utilized, and that any benefits to be derived therefrom were waived.[10]

The search and seizure was conducted to preserve evidence. There was no showing that the search warrant was authorized or executed in bad faith, or that prosecutors acted in an outrageous fashion or in purposeful violation of plaintiff's First Amendment or other constitutional rights. Non sexual materials which were found or obtained in the search were left in the premises or returned as not germane to any contemplated prosecution.

### ANALYSIS

Plaintiff does not challenge the constitutionality of Utah's obscenity/pornography statutes. Also, plaintiff has chosen not to avail herself of procedures established by the previously quoted Utah law which upon request could have triggered an immediate judicial hearing for "determination of whether probable cause exists to believe that the material is pornographic." Accordingly, the court is neither directly confronted with a claim of unconstitutionality of Utah's statutes, nor a claim that a prompt hearing was not available for determination of whether the materials seized are obscene. The only issue before the court at the present time is whether a sufficient showing has been made to support the immediate injunctive relief sought. This court exercises equitable jurisdiction in view of claims of irreparable injury which implicate the special protections of the First Amendment against prior restraint, and validity of the search warrant under the Fourth Amendment.

### I. *VALIDITY OF SEARCH WARRANT UNDER FOURTH AMENDMENT*

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause ... particularly describing the things to be seized."

#### A. *Probable Cause*

A detailed affidavit[11] was presented by police officer Gordon Smith to Utah County

---

**10.** Counsel for plaintiff in this case was also counsel in the case of *Piepenburg v. Cutler, et al.*, 649 F.2d 783, 789 (10th Cir.1981) in which the Tenth Circuit took note of and quoted Utah Code Ann. § 76–10–1212(3) and stated that "the procedures of the Utah Courts were proper ..."

**11.** Utah law provides that probable cause may be determined upon examination by a magistrate of an affidavit describing the materials sought to be seized:

Upon the filing of an affidavit for a search warrant, the magistrate shall determine, by examination of the material sought to be seized if attached, by examination of the affidavit describing the materials, or by such other manner or means that he deems necessary, whether probable cause exists to believe that the material is pornographic and whether probable cause exists for the immediate issuance of a search warrant. Upon making this determination, he shall issue a search warrant ordering the seizure of the material described in the affidavit for a search warrant according to the provisions of the Utah Rules of Criminal Procedure.

Magistrate Backlund concerning explicit sexual conduct depicted in four videos which had been rented by police officers.[12] This enabled the magistrate to "focus searchingly" on the issue of obscenity. The magistrate found probable cause to believe that the video/movies in certain areas within "Movie Buffs" premises were pornographic, that such were being distributed in violation of Utah law, and that a search warrant should issue.

By specific reference to the Utah statute on distribution of pornographic material, Magistrate Backlund excluded from the scope of the search warrant "adults only" materials of a non-sexual nature, such as violence oriented films, horror videos, witchcraft and shock-type videos. By requiring search and seizure of the video films by markings, descriptive designations and ratings contained or not contained on cardboard jackets,[13] police officers were prevented from exercising discretion in determining which sexually oriented videos to seize.[14] This also provided a means whereby comparisons could be made with records from distributors concerning what had been purchased by "Movie Buffs" and whether markings, descriptions and ratings were set forth on videos when purchased and when rented. This could also reveal whether videos with "Cable Version" stickers were marketed and sold as edited videos.

The sexually oriented videos in the "Adults Only" rooms fell within the categories set forth in the warrant. The police officers were not called upon to determine the extent of sexual orientation or the similarity of any videos to the four which had been specifically focused upon by the magistrate for obscenity. Neither were the officers required to exercise discretion or to make any determination or judgment concerning obscenity. Those determinations were made by the magistrate on the basis of scrutinizing the affidavit and the statements of a police officer about the sexually explicit and pornographic advertising on the jackets of virtually all of the videos in the "Adults Only" area. The magistrate became reasonably convinced that the sexually explicit tapes on display in the room, though unreviewed, were probably obscene. In any event, he found probable cause to compare what was being rented to the public with records from distributors as to what was sold to "Movie Buffs."

The police officers conducting the search were required to leave a receipt for the property and to prepare an inventory of property seized.[15] The titles reflected in the inventory bear out the magistrate's finding of probable cause to search for and seize all sexually oriented videos.[16]

In a general statement imploring application of common sense, the D.C. Circuit found probable cause for a warrantless search involving drugs, stating:

> Probable cause does not emanate from an antiseptic courtroom, a sterile library or a sacrosanct adytum, nor is it a pristine "philosophical concept existing in a vacuum," . . . but rather it requires a prag-

---

Utah Code Ann. § 76–10–1212(2).

**12.** See fns. 4 and 5, *supra*.

**13.** The warrant directed search for videos:

a. one copy only of each movie/video upon which there are markings such as "M" [Mature], "XXX", "Adult Viewing Only", "Adults Only", "Must be 18 years or older to view this Video" or any combination of this or similar language conveying the same information;
b. one copy only of any movie/video which does not bear a movie rating as granted by the Academy of Motion Picture Sciences of Hollywood;

**14.** Notwithstanding the facially clear directive, Officer Jeff Robinson, who participated in execution of the search warrant, apparently did exer-

cise certain discretion since he testified that in connection with seizure of the videos he took them on the basis of sexual depictions. The items thus seized, however, were within the scope of the warrant which did not require any such gratuitous, albeit well intentioned exercise of discretion.

**15.** See Fn. 6, *supra*.

**16.** According to testimony at the hearing, almost all of the cardboard jackets relating to the videos in the "Adults Only" room presented an open view of sexually explicit pictures. The advertised titles were suggestively explicit, such as "Black Men Can Hump", "Butt Woman", "Brown Sugar XXX", "A Taste of Fanny", "Nude Party", "White Men Can Hump", "Tit City", "Whore." See Inventory.

matic analysis of "everyday life on which reasonable and prudent men, not legal technicians, act."

*United States v. Davis,* 458 F.2d 819, 821 (D.C.Cir.1972) (citations omitted). The court also quoted from a similar case in which the Supreme Court said: "seldom does a decision in one case handily dispose of the next." *Hinton v. United States,* 424 F.2d 876, 879 (1969); *Davis,* at 821.

. The question presented here is whether the magistrate had probable cause to issue a warrant authorizing seizure of sexually oriented videos in the "Adults Only" rooms, even though he had only expressly focused upon four of them. First Amendment as well as Fourth Amendment concerns are thus implicated in the search. Various courts have grappled with this problem. In *Kitty's East v. United States,* 905 F.2d 1367 (10th Cir.1990) on the basis of 18 videos, the magistrate authorized seizure of any other videotapes of similar appearance, price, location and subject matter.[17] In *Sequoia Books v. McDonald,* 725 F.2d 1091 (7th Cir.1984), *cert. denied,* 469 U.S. 817, 105 S.Ct. 83, 83 L.Ed.2d 31 (1984) based upon depictions of various specific sexual activities described in the warrant as contained in nine magazines, several hundred pornographic magazines, movies and videotapes were seized and the warrant was upheld as valid. In *Supreme Video. Inc. v. Schauz,* 927 F.Supp. 321 (E.D.Wisc.1996) the district court on remand from the Seventh Circuit was directed to focus on the issue of probable cause. The district court then upheld a warrant requiring seizure of all different volumes within a series of suspected pornographic videotapes even though only one volume from each series had been reviewed. The court ruled that

Probable cause may be found or based *on any information that reasonably convinces a magistrate that unreviewed items are probably obscene.* When authorizing the seizure of unreviewed videotapes in addition to those reviewed and summarized before the magistrate, the Court is . not limited to only considering whether the unreviewed videotapes are connected to the others by the depiction of specific sexual acts. There may be other information available to the magistrate that establishes the requisite probable cause.

Id. at 326, 327 (emphasis added). The *Supreme Video* court reviewed several other cases including *Kitty's East, Sequoia,* and *Multi–Media Distributing Co. v. United States,* 836 F.Supp. 606 (N.D.Ind.1993) and concluded that "a magistrate may authorize the seizure of First Amendment materials not previously reviewed and summarized if there is information which gives rise to a 'substantial chance' that the materials are obscene, i.e., if there is probable cause." *Supreme Video* at 327, quoting *Multi–Media* at 612 and *New York v. P.J. Video,* 475 U.S. 868, 877–78, 106 S.Ct. 1610, 1616–17, 89 L.Ed.2d 871 (1986).[18] The court then pointed to the basis upon which warrants were upheld in *Kitty's East, Sequoia,* and *Multi–Media,* stating:

In *Sequoia,* identical *subject matter* was a sufficient basis for seizing the materials. In *Kitty's's East similarity of appearance, location and subject matter* was a sufficient basis for probable cause. In *Multi–Media,* probable cause was based on *extremely short "previews"* of the unreviewed videos, some of which lasted no longer than 5 to 10 seconds. The point is,

---

**17.** The *Kitty's East* court didn't purport to require those particular factors in order to find probable cause in all cases. The primary subject of the 18 videos in *Kitty's East* was "fisting, urologeria, and/or piercing." The court found probable cause for seizure of other unreviewed videos "identical in appearance to those reviewed, available in the same display area, and having the same subject matter."

**18.** In the *New York v. P.J. Video, Inc.,* case, the Supreme Court upheld a warrant as supported by probable cause that movies that were de-

scribed in an affidavit and some that were not so described were obscene and said that the application for a warrant authorizing seizure of materials presumptively protected by the First Amendment should be evaluated under the same probable cause standard used to review search warrant applications generally. The court stated that "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." (Citing *Illinois v. Gates,* 462 U.S. 213, 244, n. 13, 103 S.Ct. 2317, 2335, n. 13, 76 L.Ed.2d 527 (1983).)

whether or not probable cause exists is decided on a case-by-case basis. . . .

*Supreme Video* at 327.

■ In the case at bar, the magistrate focused on four "hard core" videos which convinced him that pornography was contained in the "Adults Only" rooms. The officers had personally observed the various video jackets and determined them to present evidence of the distribution of pornography. The magistrate knew that some of these contained markings and that others did not. It was impractical to require rental of more videos. The magistrate determined that the markings and ratings that existed or did not exist could be used to guide officers in making seizures in order to avoid unbridled discretion delegated to police officers.

Under the totality of the circumstances, this court finds that the magistrate's finding of probable cause in the case at bar did not go beyond permissible limits under the Fourth Amendment and was in substantial compliance with guidance provided by the Supreme Court:

[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

### B. *Particularity of Search Warrant*

A general warrant, such as was ruled impermissible in *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), cannot meet constitutional muster under the Fourth Amendment. The warrant in

that case was discussed by the Tenth Circuit and distinguished from the permissible warrant approved by the Tenth Circuit in *Kitty's East, supra*. After discussing specifically identified videotapes, the *Kitty's East* court approved seizure of additional tapes not specifically identified, stating:

The officers executing the local warrant were not left to their own devices in determining which videotapes they should seize as obscene and which subjects were most offensive. The local warrant listed eighteen named videotapes and described in detail, though not by name, other seizable videotapes. This case therefore differs from *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979). In Lo–Ji, the Supreme Court held invalid a general search warrant issued by a magistrate who then accompanied the police to the bookstore to make on-the-spot determinations of obscenity. Once the magistrate identified an item as obscene, he then instructed the police to seize all similar items. The determination of what constituted a "similar" item was, however, left solely to the discretion of the executing officers. *Lo–Ji* at 327, 99 S.Ct. at 2324–25.

*Id.* at 1373. The court upheld the search warrant in *Kitty's East* against claims of overbreadth, and said:

Although ordinarily it would be preferable to identify the *videotapes by name and include in the affidavit descriptions of the specific contents of each* videotape, under the circumstances of this case we do not deem the failure to do so constitutionally fatal, particularly given that this was a seizure to secure evidence and not a seizure for the purposes of suppressing or destroying the allegedly obscene material. *Id.* at 1373. (Emphasis added.)

The *Kitty's East* court noted the "thin line" between a permissible and an overbroad warrant,[19] but observed that less specific description was approved by the Seventh Circuit in

---

**19.** The court said:

There is no question, however, that the warrant's language approaches the *very thin line between the comprehensiveness necessary to effective law enforcement and a failure of particularity which permits law officers to engage in a "general exploratory rummaging in a person's*

belongings." 905 F.2d at 1374, quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). In the case at bar, this court is cognizant that the search warrant is even closer to the permissible limit of that very thin line. The warrant here is far from a model of particularity, as

upholding a search warrant against a challenge of lack of particularity in *Sequoia Books, Inc. v. McDonald,* 725 F.2d 1091 (7th Cir.1984). In that case, Judge Posner noted the realities and practical difficulties having to do with seizure of obscene materials and said:

There was, it is true, a possibility that photographs of sexual acts might be redeemed by aesthetic or other values, and hence that the officers might seize constitutionally protected materials. *But the possibility was slight.* And it must be remembered that *seizure under a warrant is not destruction* (a distinction stressed in *Heller v. New York,* supra, 413 U.S. [483] at 488–93, 93 S.Ct. [2789] at 2792–95 [37 L.Ed.2d 745 (1973) ] ); *it is temporary removal from the owner's possession;* the state cannot destroy a magazine as obscene without proving that its prurient character is unredeemed by artistic or other socially valuable properties. *The slight possibility of a temporary suppression of constitutionally protected sex magazines is not enough to invalidate the warrant under the Fourth Amendment.* Nor would it be feasible to eliminate even this slight possibility by requiring that the warrant name the particular issues of the particular magazines to be seized. The defendant officers would have had to buy every issue of every magazine that they thought obscene—not just the nine magazines that they described to the magistrate. But their attempts to do so would have aroused Sequoia's suspicions, and it would have refused to sell them. Or if the officers had reason to believe that Sequoia was warehousing obscene magazines somewhere, under Sequoia's view they could not search the warehouse unless they happened to know the names and dates of particular magazines and those would be the only items they could seize.

*Id.* at 1093–94 (emphasis added).[20]

In the case of *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), the Supreme Court outlined procedures for constitutionally permissible seizures of movie films and testing the validity of a warrant. The Supreme Court said:

If such a seizure is *pursuant to a warrant,* issued after a *determination of probable cause by a neutral magistrate,* and, following the seizure, a *prompt judicial determination of the obscenity issue in an adversary proceeding is available* at the request of any interested party, the seizure is constitutionally permissible. * * *. By 'prompt' we mean the shortest period compatible with sound judicial resolution. . . . The necessity for a prior judicial determination of probable cause will protect against gross abuses, while the availability of a prompt judicial determination in an adversary proceeding following the seizure assures that difficult marginal cases will be fully considered in light of First Amendment guarantees, with only a *minimal interference with public circulation pending litigation.*

413 U.S. at 492–93, 93 S.Ct. at 2795 (emphasis added) (citations omitted).

■ The search warrant in this case comes within the permissible rule set forth in *Kitty's East* and in essence is similar to the warrant discussed by the Seventh Circuit in *Sequoia.* The warrant in this case is not a general rummaging warrant such as was rejected in *Lo-Ji.* The safeguard procedures testing validity of a warrant as set forth in *Heller* are present. Accordingly, this court upholds the warrant for search and seizure of the videos as against claims of overbreadth under the Fourth Amendment to the U.S. Constitution.

### C. *Video Found on Counter Top*

■ The warrant in this case authorized search of the area "on top of cashier/front counter." The videotape of "Shooting Star"

counsel for plaintiff eloquently argued to the court. Nevertheless, under all of the circumstances it appears that the magistrate was justified in finding probable cause and "substantial chance" as previously discussed, and in authorizing a comprehensive warrant.

20. The *Kitty's East* court also referenced *In re Property Belonging to Talk of the Town Bookstore,* 644 F.2d 1317, 1319 (9th Cir.1981) upholding seizure of books, magazines and films depicting specific sex acts described in affidavits attached to warrant.

(Defendants' Exhibit 1) in a sexually explicit jacket was found there in plain view, in the apparent custody or proximity of a juvenile employee. In addition to seizure pursuant to the warrant, the officer took the video because it was in the constructive possession of a juvenile, in violation of other portions of Utah's pornographic statute.[21] This court rules that since peace officers were legally on the premises, that video was properly seized as called for in the warrant, and for the further reason that there was probable cause to seize the video for possible commission of a criminal offense in the presence of a peace officer.

### D. Customer Records

■ The warrant required search and seizure of records of "any rental or sale of movies and/or videos" described in the warrant. Public release of these customers records could cause great mischief and potential harm. It is not illegal for adults to view, rent or purchase non obscene materials. According to the general manager of "Movie Buffs," no obscene videos were displayed or available for rental because only "Cable Version" edited copies were being rented and sold. If that is true, the videos simply may not be obscene. However, this could be a case of "willful blindness" insofar as Movie Buffs is concerned. If the video distributors were falsely labeling truly obscene videos with "Cable Version" stickers, unbeknownst to Movie Buffs, it could be a case of negligence for failure to check and control· the product being offered for sale or rental. Or it could evidence a conspiracy between distributors and the rental company to distribute pornographic material under the guise of supposedly edited "Cable Version" videotapes. Whatever the case, customers who rented such videos had no notice that the videos contained impermissibly explicit sexual content. The only notice such customers

had is that the video is acceptable for cable, thus presumably legal. It would be unjust for persons who rented videotapes at "Movie Buffs" to have their records publicly revealed under allegations of knowing participation as renters of pornographic material. Moreover, some or all of the videos ultimately may be determined not to be obscene.

At the evidentiary hearing it was represented to the court that Utah County does not necessarily intend to use such records in prosecutions. But that could change and prosecutorial policy could change. Records could be inadvertently revealed or names released to the prejudice of customers who rented or purchased videos as they had a right to do.

For all of the reasons set forth above, the court orders defendant Utah County to seal all records seized of "any rental or sale of movies and/or videos" described in the search warrant relating to customers, and to deliver those records to this court forthwith; except that records relating to the rental by police officers of the sexually explicit videotapes described in the affidavit need not be so sealed or delivered. The sealed records shall not be opened or accessed by anyone, or destroyed, except upon the express order of this court after full hearing.

### E. Records of Purchases from Distributors

■ The warrant directed search and seizure of "documents or information" regarding the "purchase, order or delivery" of the videos described in the warrant. Knowing that "Movie Buffs" had obtained a license from local governmental units to operate a legal business, which would exclude distribution of obscene material, the magistrate focused upon whether obscene materials were being supplied to "Movie Buffs" in furtherance of a conspiracy. This would require

---

21. (1) A person is guilty of dealing in harmful materials when, knowing that a person is a minor, or having failed to exercise reasonable care in ascertaining the proper age of a minor, he:

(a) knowingly distributes or offers to distribute, exhibits or offers to exhibit any harmful material to a minor;

(b) produces, presents, or directs any performance before a minor, harmful to minors, or

participates in any performance before a minor, harmful to minors; or

(c) falsely pretends to be the parent or legal guardian of a minor and thereby causes the minor to be admitted to an exhibition of any harmful material.

Utah Code Ann. 76–10–1206.

comparison of the videos available for rental to the public with the documents of sale and delivery of such videos. Such comparison could also reveal whether the obscene nature of the videos was being concealed by the placement of misleading stickers such as "Cable Version," or other surreptitious means. This constitutes an additional reason for seizure of the videos according to markings, ratings and categories which could show up in records describing the terms of sale, and otherwise describing the videos.

The court upholds the warrant as related to search and seizure of records concerning the purchase, order and delivery of the videos, and for seizure of the videos in order to inventory and compare them with such records.

## II. VALIDITY OF THE SEARCH WARRANT UNDER FIRST AMENDMENT

### A. Prior Restraint

In denying a request for injunctive and/or declaratory judgment relief, the court in *Supreme Video* rejected the claim that the search warrant imposed a prior restraint as to videos seized but not reviewed. The court said

[o]ne cannot lose sight of the limited purpose of the warrant in this case. This was not a case where a warrant was used to destroy the videotapes at issue and/or to impose a prior restraint upon the viewing of First Amendment materials. *Rather, the videos were seized for the limited purpose of gathering and preserving evidence* . . .

927 .F.Supp. at 328 (emphasis added). The case at bar is similar. Seizure was for preservation of evidence, not destruction thereof.

In response to the assertion that the First Amendment prior restraint prohibition would

be violated by upholding the search warrant in *Kitty's East*, the Tenth Circuit found no prior restraint, stating:

Kitty's's has failed to demonstrate that it is aggrieved by an unreasonable retention of the property. With regard to the videotapes seized, Kitty's's had made no argument that the seizure has precluded all exhibition or rental of the videotapes in question. Kitty's's First Amendment rights are not sufficiently infringed by the government's seizure for evidence of a few copies of a limited number of videotapes to be "aggrieved" under Rule 41(e). Cf. *Heller v. New York*, 413 U.S. 483, 490–93, 93 S.Ct. 2789, 2793–95, 37 L.Ed.2d 745 (1973).[22] *Id.* at 1376.

Similarly, in *Multi–Media Distributing, supra*, the district court rejected prior restraint assertions and said:

The seizure of only two copies of each of the video cassettes named in the warrant does not amount to a prior restraint. See *In re Grand Jury Subpoena*, 829 F.2d 1291, 1298–99 n. 9 (4th Cir.1987); *Supreme Video*, 808 F.Supp. at 1397–98 (no prior restraint absent showing that all copies of relevant videos were seized). The law is clear that "a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause" so long as the book or film is "not taken out of circulation completely." *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63, 109 S.Ct. 916, 927, 103 L.Ed.2d 34 (1989); *Heller*, 413 U.S. at 492, 93 S.Ct. at 2794–95. The same reasoning applies where two copies are seized.[23]

██ In the case at bar, only one copy of each film was permitted to be seized and there was no showing that this resulted in

*Kitty's East*, at 1373, Fn. 5.

---

**22.** The proceeding in *Kitty's East* was for return of property pursuant to the then applicable Rule 41(e), Fed.R.Crim.P. The court noted that no showing had been made that the seizure had resulted in total censorship of the films in question, and that movant had failed to carry the burden of proof in that regard. The court said: Testimony at the hearing indicated that the officers seized no more than two copies of all but one film, and only three copies of that film.

**23.** In the *Multi–Media* case officers seized two copies each of 86 videos, nine magazines and a customer list. The search warrant was issued based upon an affidavit describing the advertisements for, and the affiant's observations of, thirteen videos and nine magazines.

full censorship.[24] Moreover, the safety valve provided in Utah law to make a copy of any video and continue to circulate any film seized has not been utilized by plaintiff. Counsel for plaintiff has also made it very clear that no immediate obscenity hearing as provided in Utah law is requested or desired. Even though these safeguards have been waived by plaintiff, *availability* of such obviates the existence of impermissible prior restraint in this case. This was made clear by the Supreme Court in *Heller v. New York*, wherein the court said:

> ... the *availability of a prompt judicial determination in an adversary proceeding* following the seizure assures that difficult marginal cases will be fully considered in light of First Amendment guarantees, with only a *minimal interference with public circulation* pending litigation.

413 U.S. at 493, 93 S.Ct. at 2795 (emphasis added).

This court concludes under the facts presented that no impermissible prior restraint occurred in violation of the First Amendment of the U.S. Constitution.

## III. *INJUNCTIVE RELIEF*

Injunctive relief is available only upon a showing that plaintiff (1) will suffer irreparable harm if the injunction does not issue; (2) there is a substantial likelihood of success on the merits; (3) proof that the threatened injury to the movant outweighs any threat of injury to the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980).

### A. *Irreparable Injury*

■ This court has exercised equitable jurisdiction fundamentally because of the claims of violation of the First and Fourth Amendments to the U.S. Constitution by reason of the search and seizure which occurred. Those constitutional claims are the fundamental basis upon which plaintiff asserts ir-

reparable injury in support of her motion for preliminary injunction. However, this court has ruled that plaintiff suffered no constitutional harms as a result of the search and seizure.

Plaintiff also claims that the threat of criminal prosecution is a valid reason to issue injunctive relief. The Tenth Circuit, in agreement with other courts, has ruled that such is not a sufficient reason to find irreparable injury:

> The Eighth Circuit has ... rejected the proposition that imminent indictment is injury sufficient to invoke Rule 41(e) jurisdiction, *Kiesel Co. v. Householder (In re Search of 4801 Fyler Ave.)*, 879 F.2d 385, 388–89 (8th Cir.1989), cert. denied, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990), and this circuit has also recently held that "the mere threat of imminent indictment does not establish irreparable injury as required for a motion under Rule 41(e)," *Blinder, Robinson and Co. v. United States*, 897 F.2d 1549, 1557 (10th Cir. 1990).

*Kitty's East* at 1371.

This court finds that in the absence of constitutional violations injunctive relief is not warranted simply because the state may proceed with criminal prosecutions.

Turning to plaintiff's attempt at the evidentiary hearing to establish irreparable injury apart from the alleged constitutional harms, plaintiff's proof failed on the issue. Testimony by plaintiff's operations officer was to the effect that even in the highly competitive video market and in spite of the search and seizure, gross sales of the Movie Buff stores *increased* by over $200,000 during the month following the seizure. This was an increase the plaintiff's General Manager could not explain on the basis of seasonal fluctuations, or otherwise. Plaintiff failed to produce records which constituted the underlying basis for testimony relating to the alleged impact and claim of irreparable damage caused by the search and seizure. The safeguard procedures available to plaintiff but waived provided an immediate vehicle for

---

**24.** Apparently some duplicates were picked up because the warrant was executed at two locations. The court directed that only one video copy be retained and presumably all duplicates have been returned. Because Movie Buffs has twenty (20) outlets in Utah it is not likely that Utah County has possession of the only copy of films seized. No such showing was made by plaintiff at the hearing.

preventing irreparable injury. In all events, plaintiff failed to show that monetary damages could not provide an adequate remedy.

This court rules that plaintiff has not demonstrated irreparable injury necessary to sustain injunctive relief.

### B. *Other Elements*

The court rules that there is not a substantial likelihood of success on the merits. Among other reasons, plaintiff could not justify the distribution of pornography as hereinbefore set forth. In any event, qualified immunity would seem to apply. There was no evidence of an unconstitutional policy in effect by Utah County which would authorize unlawful searches. Neither was it shown that individual defendants as reasonable officers of the law were on notice of established law which would preclude the search under the circumstances of this case. Apart from prevention of constitutional harms, which this court has discussed and rejected, the court finds that the threatened injury to plaintiff in terms of monetary damage weighs less than the threat of injury to defendants in terms of vindicating the community standards in Utah County against the distribution of pornography. The court also regards the public interest factor to weigh against plaintiff and in favor of defendants.

Based upon the foregoing, plaintiff's motion for preliminary injunction is DENIED.